LADD, C. J., and GAYNOR and WITHROW, JJ., concurring.

---

NORA SANDERSON, Administratrix of the Estate of Joe H. Sanderson, Deceased, Appellee, v. CHICAGO, MILWAUKEE & ST. PAUL RY. CO., Appellant.

**Trial:** ISSUES OF LAW AND FACT: DETERMINATION. Where the evidence
1    regarding a material fact is such that honest minds may fairly differ as to the existence or non-existence of the ultimate fact sought to be established, the issue is for the jury; but where there is no dispute in the evidence as to the existence or non-existence of the fact, or where it is such that reasonable minds cannot honestly differ then it becomes a question for the court.

**Contributory negligence:** BURDEN OF PROOF: EVIDENCE. To recover
2    upon the ground of negligence the plaintiff must not only prove the negligence of the defendant, but he must also affirmatively show his own freedom from contributory negligence. In this action the evidence fails to show that plaintiff, a transfer man of mature years while at the station to meet the trains, was free from contributory negligence in crossing one of the tracks, in that it fails to show that he exercised reasonable care to discover an approaching train which struck him, and which he knew was momentarily expected to arrive.

**Same:** INSTINCT OF SELF-PRESERVATION. Where there were no eyewit-
3    nesses to an accident resulting in death, and to the manner in which deceased was conducting himself at the time or immediately before, a presumption arises that he was exercising reasonable care for his own safety at the time; but this presumption is one of fact and whether it was overcome by other circumstances shown in evidence is a question for the jury to determine. This presumption, how-
ever, does not obtain where there was direct evidence of the circumstances offered by the party invoking it, or where it was within the power of the party whose duty it was to prove the circumstances to produce affirmative evidence of the facts.

**Same:** DIVERSION OF ATTENTION.  To excuse one of contributory negligence on the ground that his attention was diverted from himself and his peril, there must be some showing of facts which, under usual and ordinary circumstances, would have the effect of diverting his mind from a vigilant care of his own personal safety.

**Same:** BURDEN OF PROOF.  In personal injury actions the burden is always upon the plaintiff to negative contributory negligence; and while the absence of any eyewitness to the circumstances surrounding a tragedy may give rise to an inference that the party was in the exercise of care for his safety, such inference cannot be relied upon to excuse the plaintiff from producing such evidence as was at hand or within his reach, tending to show the conduct of deceased to the time of the tragedy, thus in effect shifting the burden to defendant to show that the injured party was in fact negligent.

*Appeal from Hancock District Court.*—HON. J. J. CLARK, Judge.

TUESDAY, OCTOBER 20, 1914.

ACTION to recover damages for personal injury resulting in death.  *Reversed* and *Remanded.*

*John Hammill* and *Cook, Hughes & Sutherland,* for appellant.

*Senneff, Bliss & Witwer,* for appellee.

GAYNOR, J.—The plaintiff brings this action as administratrix of the estate of Joe H. Sanderson to recover damages for his death.  It is claimed that his death was the result of injuries received by being struck by an engine on one of defendant's passenger trains, on the morning of the 9th day of April, 1912.  The accident occurred in the town of Garner.  The deceased was a man of forty-five years of age.  He had lived in this town for thirteen years, and at the time of his death was engaged in the dray and transfer business.  During the last years of his life, he had made the morning trains each

morning in the discharge of the duties connected with his business. These morning trains referred to were the trains operated on defendant's tracks, and it appears that the defendant's east and west bound trains were in the habit of meeting at this station in Garner, and did meet there whenever the trains were on time. It appears that defendant's tracks, at the point where the accident occurred, run east and west; that there are two tracks, one next to the depot and one a few feet immediately north of the first track; that the track immediately north of the depot is known as the main track. A short distance north of that is what is known as the passing track. These tracks are parallel until they reach a point somewhat west of the depot, at which place the tracks curve sharply to the north. It appears that on the morning of the accident, about 8 o'clock in the forenoon, the west-bound passenger train arrived from the east and was standing on the side track. It appears that it had arrived some time before the east-bound train, which caused the accident arrived, and had pulled up to the depot on the main track, unloaded its passengers and baggage, and had received such passengers as desired to take passage on that train for the west, and then backed east to the switch and had been pulled up upon this passing track along the north side of the main track. So far as the record discloses anything upon this question, both these trains were on time that morning, and the west-bound train was pulled up on this passing track to allow the east-bound train to come in and occupy the main track at the depot. There is no evidence in this record as to what Sanderson was doing immediately before the injury, or what he had been doing that morning before the accident. There is evidence that prior to this morning, this west-bound train, when placed upon the passing track, usually pulled to the west end of the switch, before the east-bound train came in. It appears that on this morning, the engine on the west-bound train had passed the station on the passing track to a point more than one hundred feet west of the station. It appears that there

is a street west of the depot that runs north and south; that this street was about a block west of the center of the depot. The depot extends east and west on the south side of the main track, and is about forty-five feet long east and west. There is nothing in the record to show the distance between the north rail of the main track and the south rail of the passing track. There is nothing to show at what point this passing track connects with the main track on the east, or where it enters upon the main track on the west. There is evidence in this record upon which the jury might well have found the defendant to be negligent in respect to some of the matters charged as negligence in the petition. Thus it is charged in the petition that the defendant failed to give any notice or warning of the approach of the train from the west; that defendant failed to ring the bell before reaching the street or highway west of the depot, or while approaching the place where plaintiff was struck. At the conclusion of the plaintiff's testimony, the defendant moved for a directed verdict, basing its motion upon the fact that the plaintiff had failed to show that the deceased was not guilty of negligence contributing to his injuries, and, further, that the record affirmatively showed that the deceased was guilty of contributory negligence precluding a right to recovery. The motion was overruled. The defendant introduced no evidence. The cause was submitted to a jury; a verdict returned for the plaintiff; judgment entered upon the verdict. Defendant appeals, assigning error on the action of the court in overruling defendant's motion for a directed verdict.

The defendant makes several assignments of error, but in the view we take of the case, it is unnecessary to discuss more than one. That is; Has the plaintiff failed to show that the deceased was free from negligence contributing to the accident which caused his death, and does the record affirmatively show contributory negligence on his part?

But one witness was produced upon the trial who claims

to have seen the deceased immediately before and at the time he was struck. He testifies, substantially as follows:

I was standing at the east end of the depot at the time when the west-bound train pulled into the station, and the passengers were unloaded. After it got through with its work, it backed down to the switch and took the switch track and pulled up to the depot on the passing track, and stopped with the engine and baggage car past the depot, the engine being east of and within a coach length of the water tank. I saw Mr. Sanderson there when the west-bound train was standing on the side track. I saw him run across the track to the west-bound train. I did not see any one wave for him to come. I think some one called him. I thought I heard some one call him. I do not know who it was. I did not notice him until I saw him run across the track. This was before the east-bound train came into the depot. He had started across the track before I saw the east-bound train coming. I first saw the east-bound train, the one that caused the accident, when it came to the water tank. I should judge this water tank is between eighty and one hundred feet from the depot, about that. My best judgment is that it is one hundred feet from the west end of the depot. The depot is forty-five or fifty feet long. Sanderson was at the east end of the depot, or near there, when he started to cross the track. I was standing about four feet east of the east end of the depot, and Sanderson was about ten feet to the west and to the north of me when he started. He ran right across the track.

He was asked this question then:

Did he get clear across the track, or did the train strike him as he stood? A. He stood there. Yes, the train struck him as he stood. Q. How long do you think he stood there? A. I do not know. It was not very long. A fraction of a minute or a minute. He was facing to the north. I do not think he was looking towards the east. He was not looking in the direction in which the train came, and so far as I saw, he did not look in that direction. I did not see him look that way. He might, and he might not.

He was then asked this question:

Well you saw him all the time, didn't you? A. I saw him all the time. I did not see him look in that direction at all. I cannot say that I did. I did not see him look that way. He was looking straight north all the time, from all I know, and I saw him from the time he left the depot platform until the time he was struck. The west-bound train, on the passing track, was not moving when he was hit, but it was moving when he started across there. Mr. Hanson and a lady were across the track right by him. The lady was going to get on the train, I suppose. I did not see her get on. I know she was standing at the coach of the west-bound train, and a baggage car and mail car were ahead of the coach. Also the smoker and the engine of the west-bound train. The engine on the west-bound train was emitting considerable smoke. The wind was from the northwest, and the smoke blew across there down around the depot, and down where I was standing. I saw the engine of the west-bound train when it struck Sanderson. When the engine struck him, he was facing approximately north. I have noticed this west-bound train before. Usually, after its work is done and it takes the passing track, it pulls up west to the switch. The switch is away out there. It is a long passing track, a number of rods. Before this morning, I had observed that when defendant's west-bound train stopped on the passing track for the east-bound train to pass, it pulled up to the end of the passing track to the switch. I never saw the west-bound train standing in the position it stood this morning. They generally pull up a little further.

The evidence discloses that this train, after it passed the water tank, approached the place where Sanderson was struck at from seven to nine miles an hour. It appears that it stopped at the station, at the place it usually stopped, for the purpose of loading and unloading passengers. At least there is no evidence that it did not stop at the usual place at which it was stopped at this station. There is evidence that this west-bound train, on the passing track, usually pulled to the other end of the switch to be ready to come on the main track, before the east-bound train came in.

S. S. Williamson, called for the plaintiff, testified that since the morning on which Sanderson was injured he had made some observations for the purpose of ascertaining how far west a person could see, along the main track, from the point where Sanderson was struck. He testified as follows:

I have since that morning stood about the position where we found Mr. Sanderson, and sighted west along between the two rails. My line of vision crossed the main track a little west of the water tank. The further south you went, the further you could see to the west.

Chas. Schoenwetter, testifying for the plaintiff, says:

I have, since the time Sanderson was killed, been down to the depot when the west-bound train was standing in about a similar position as it was that morning. I stood right between the trains. Standing in that position, I looked west along between the tracks, and my vision crossed the main or south track about twenty feet west of the crossing (that is the street heretofore referred to), and would cross the south rail of the main track about twenty feet west of that. The street crossed the track there, and my vision would cross the south rail, on the main track, about twenty or thirty feet further west. This west street, I should think, is about thirty feet west of the water tank. That is, the east side of the street is about thirty feet west of the water tank. I stood at the place where Sanderson was supposed to have been struck. I went as near as I could to the place where he was injured.

It does not appear from this evidence on which side of the main track this water tank stood.

This is all the evidence offered by the plaintiff, and submitted to the jury upon this question, and from this testimony, we are asked to say that it affirmatively appears that the deceased was free from negligence contributing to his injury. Can we do this?

Facts about which there is controversy must be submitted and determined by the jury, when the evidence of the existence

or nonexistence of the facts is such that honest minds, search-

**1. TRIAL: issues of law and fact: determination.** ing for the truth, fairly and dispassionately weighing the evidence, might differ as to the existence or nonexistence of the ultimate fact sought to be established by the evidence. But, however, where there is no dispute in the evidence, as to the existence or non-existence of the fact, or where the evidence is such that reasonable minds, honestly searching for the truth, could not differ as to the existence or nonexistence of the fact, then it becomes a question for the court.

It has always been the rule in this state that to entitle the plaintiff to recover for personal injuries, the burden rests upon him, not only to prove the negligence of the defendant

**2. CONTRIBUTORY negligence: burden of proof: evidence.** relied upon for recovery, but that he was free from any negligence on his part contributing to the conditions out of which the injury arose, and unless the evidence affirmatively shows that the deceased did not, by his own negligence, his own want of ordinary care, contribute to his injury, he cannot recover.

There certainly is nothing, in this record which affirmatively shows that the deceased in this case was exercising that care for his own safety which a reasonably prudent and cautious man would exercise under like circumstances and under like conditions. It affirmatively appears that deceased was well acquainted and familiar with the conditions that attended his action that morning. He knew that a train was due from the west. He knew that the west-bound train had gone upon the side track to allow this east-bound train to come into the station. The east-bound train was on time. When on time, this was its passing point. He was a man of years and of experience. The evidence shows that this train approaching, that caused the injury, could be seen from the point where he was injured over two hundred feet. It was seen by the witness Rhoades, who was called and testified as to the position in which plaintiff was standing at the time he

was struck, when it was at the water tank, from eighty to one hundred feet west of the west end of the depot. There was no evidence as to whether the train could or could not be seen approaching at the time deceased left the platform of the depot. The witness, who saw him leave, said that he saw the train for the first time at the water tank, but the evidence discloses that it could have been seen, under ordinary conditions, farther west. Relying upon this evidence, no one can say affirmatively that by it deceased is shown to have been free from contributory negligence. He went voluntarily upon or over the track and stood on or so near it that he was struck, knowing that a train was due to arrive, and stood at a point where, if he had been giving attention to his situation, he could have seen the peril from a passing train in time to have removed himself from the zone of danger.

But it is claimed that the eyewitness of his conduct did not see him immediately before, and at the time of his injury, and reliance is had upon some uncertain statements, by the witness that appear in his testimony, in which he says: ''I did not see him look to the east while he stood there. He might, or he might not. I saw him all the time. I did not see him look in that direction. I did not see him look that way. I cannot say that I did. He was looking straight north all the time''—and some further statements made by the witness, to the effect that he had crossed the track; that he saw him run across the track before the east-bound train came in. ''When I first saw the east-bound train, when it came to the water tank, I do not know where he stood then. He had started across before I saw this train,'' from which the inference might be drawn that he did cross the track and was returning at the time he was struck. But this witness also testified, just as positively, in answer to this question:

Did he get clear across the track, or did the train strike him as he stood? A. He stood there. Yes, the train struck him as he stood there. Q. How long do you think he stood

there?   A. A fraction of a minute, or a minute, and was not looking in the direction in which the train was coming.

It is argued that this witness did not make such observations of the deceased's conduct as enabled him to say positively and directly what the conduct of the deceased was at the time of his injury, from which it can be known whether he was or was not exercising reasonable care for his own safety at the time he was struck.   It is contended that the smoke from the west-bound train might have obscured deceased's vision. There is evidence that it reached the point where the witness Rhoades was standing.   This was south of these tracks, and at a point east of the depot.   It is claimed that the smoke might have obscured deceased's vision so that he could not see the train approaching, but this does not help the situation, if true, for the reason that he had voluntarily placed himself in this position of danger, with knowledge that the train was due, and with his view of the approaching train obscured.   A little attention to his position would have told him where he stood, and the natural instinct of self-preservation would suggest that he step aside.   He could have done this with very little effort.   He was familiar with the trains and the time of their arrival.   He was familiar with the location and the position he occupied.   The jury would not be justified in assuming, in the absence of any showing to the contrary, that this testimony, given by the eyewitness, "that he stood looking to the north at the time he was struck," was not a true statement of the fact.   It must be borne in mind that this testimony was offered by the plaintiff, and all the testimony on this point.   It must be borne in mind that the burden was on the plaintiff to establish freedom from contributory negligence.

It might be argued that the deceased was occupied at the time, and his attention temporarily diverted from the danger of his position, but the only testimony, from which any such

inference could be drawn is the testimony of the witness Rhoades, and this testimony is substantially as follows:

Q. Did you notice after he got across, went over the main track, or part way over it, as to what he was doing—whether he was engaged in doing anything—talking with anybody? A. I think some one called him—I thought I heard some one call him, I don't know who it was.

With the further testimony:

The west-bound train was not moving when he was hit, but it was moving when he started across there. Mr. Hanson and a lady were across the track, right by him. The lady was going to get on the train, I suppose—I didn't see her get on. I know she was standing at the coach of the west-bound train.

Neither Mr. Hanson nor the lady was called as witnesses on the trial. Whether he was conversing with them or not, whether he was called to that position by them or not, is not made to appear and there is no showing why these witnesses were not called. They certainly could have given material evidence upon this point. Their presence at that point must have been known to the plaintiff, or could have been easily ascertained from the witness Rhoades. There is no evidence that the deceased had any business with Hanson or the lady, either at that time or at any time that morning. The inference that his mind was temporarily diverted must be drawn from the proof of the existence of some fact, the tendency and effect of which would be to divert attention. If these facts existed, it lay within the power of the plaintiff to make the proof. If he were called by Hanson across the track, if he went there on business, if he was conversing with Hanson or the lady, these facts were susceptible of proof, and the proof was available. The plaintiff for some reason unexplained, has failed to call these witnesses, or make this proof, and would have the court and jury draw an inference from an inference in the absence of the proof of the fact from which

the inference might be drawn.    There is no proof that Sanderson contemplated taking this west-bound train that morning. There is no proof that he had any business with this west-bound train other than is found in the testimony of Rhoades that he thought he heard some one call him, but does not know who it was, and the further fact that he was right by Hanson and the lady, whom the witness supposed was about to take the train.    As to that lady or these parties, too, there is no evidence that they did take the train, or how they came to be in the position they were, or why they were there at the time the east-bound train arrived.    Before a fact can be said to be proven, even prima facie, there must be some substantive evidence of the existence of the fact.    A jury ought not to be turned loose in the field of speculation, and guess as to what the facts are, and surely, where they are living witnesses, by whom facts could be proved, if they existed, and they are not called, and no reason given for not calling them, where it does not appear that they are not within easy reach of the person having the burden of proof as to the fact, the field of speculation and inference ought to be closed.

We are told, however, that the evidence does not disclose the existence of an eyewitness as to what the deceased was doing immediately before and at the time of the accident;

3. SAME: instinct of self preservation.

that the witness, who claims to have observed, expresses some doubt as to the fullness of his observation touching the conduct of the deceased at that time, and we are therefore asked to invoke the rule, which has been well recognized in this state, that in case of an accident resulting in death, and there are no eyewitnesses to the manner in which the deceased was conducting himself at the time of the accident, or immediately before the accident, the jury are justified in drawing the inference that he was exercising reasonable care for his own safety at the time; that in the absence of an eyewitness, the inference to be drawn from the instinct of self-preservation could be properly considered by the jury.    Or, in other words, as held in *Gray v. Ry. Co.*, 143 Iowa, 268, in the absence of direct

evidence as to what deceased did or failed to do, by way of precaution, at and immediately before the injury, the presumption that he, prompted by a natural instinct, was in the exercise of care for his own safety obtained, and this pre sumption is one of fact, and the question of whether it was overcome by other circumstances shown in the evidence is for the jury to determine. However, there is no presumption of law, based upon the natural instinct of self-preservation, that one is exercising reasonable care for his own safety at any time. It is simply an inference from the observed fact that men usually and ordinarily do exercise care for their own safety.

But this presumption, however, does not arise where there is direct testimony introduced by the party who invokes the presumption as to the conduct of the party injured, or where it lies within the power of the party who has the duty of proving this ultimate fact to produce testimony which will show affirmatively the existence of the fact.

There is no substantive evidence that he was called to the position of danger by any one. There is no substantive evidence as to why he went there. There is no evidence that, while there, his attention was diverted from the peril that attended his position. We are asked to draw the inference that because Hanson and the lady were standing near him, at the time he was struck, that his attention was diverted by this fact, without the proof, which was available, that he was called there by them, had any business with them, was engaged in conversation with them, or that he or they sustained any relationship to each other, either of a business or social character.

Before a party can be excused in the doing of that which constitutes negligence, on the ground that his attention was diverted from himself and his peril, there must be some showing of the existence of some fact, condition or circumstance which, under the circumstances usually and ordinarily has the effect of diverting the mind from a viligant supervision of the physical

4. SAME: diversion of attention.

being placed in and under its control. The mind perceives through the senses, and directs our action, or, having perceived, retains in the memory the conduct to be pursued that guides to safety, or, having perceived and remembered, deduces from the past, the course that leads to safety. Ordinarily the mind, through the senses, guards and protects the body, and before we can assume that it was diverted from its purpose, there must be some showing of some fact which usually and ordinarily has the effect to so divert it.

As stated before, the burden of proof rests upon the plaintiff not only to show the negligence of the defendant, upon which liability is predicated, but also that the injured person was free from any negligence on his part contributing to his injury. This burden rests upon the plaintiff at all times, and never shifts to the defendant. The absence of an eyewitness to the tragedy does not shift the burden of proof upon the defendant to show that the injured party was not exercising reasonable care for his own safety. It is true that, in the absence of any direct evidence whatever as to how the deceased was conducting himself at and immediately before the injury, the instinct of self-preservation may be considered, and will constitute a sufficient basis for the inference of want of contributory negligence. But, as said in *Bell v. Town of Clarion,* 113 Iowa, 126:

5. SAME: burden of proof.

> Where there is direct evidence as to whether or not the injured party was negligent, then the inference is entitled to but little, if any, weight.

The court further said in this case:

> The instruction given by the court in the case we are now considering was to the effect that, in view of the instinct of self-preservation, a presumption arises that the injured person was careful, which presumption will prevail unless overcome by evidence satisfying the jury that the injured person was negligent. This statement of the law, if it were

correct, would entirely revolutionize the doctrine, well established in this state, that the plaintiff has the burden of proving freedom from contributory negligence. If a presumption of due care is to be entertained, then the burden of proof would, in practically every case, be upon the defendant to show that the plaintiff was negligent. The mere statement of this proposition is sufficient to show that it is erroneous. The court was, no doubt, misled by the ambiguous use of the word 'presumption,' which is found in some of the cases. Frequently that word is used as indicating merely an inference which may be drawn from certain facts, and where it has been used in the previous decisions of this court in this connection it must be so interpreted.

To say that an inference may be drawn from the well-recognized instinct of self-preservation, that an injured person was in the exercise of due care for his own safety, in the absence of all evidence tending to show how he was conducting himself at the time is to present an entirely different proposition than to say that a presumption arises, in absence of proof to the contrary, that a person was exercising due care for his own safety, where there is no eyewitness, and that this presumption will prevail unless overcome by evidence that he was not exercising due care. The first is an inference of the existence of a fact from a fact that is well recognized, to wit, that all animal life is possessed of the instinct of self-preservation, and usually and ordinarily is led by this instinct, to avoid injury. This is an inference which may or may not be drawn, in the absence of an eyewitness, from all the facts submitted to the jury, and is based on the thought that all reasonable human beings are inspired by a natural love of life, and are moved by an instinct which leads them to avoid physical harm. The physical facts, however, in the absence of all testimony, may negative this inference. Common experience shows that men do become negligent and careless in their conduct, and, by such negligence involve themselves in dangers from which they may or may not escape. All negligence is bottomed on the thought that one has done, or omitted

to do, something which a reasonably prudent and cautious man would not do, or omit to do, under like circumstances.

It has never been held, nor would it present a sound legal or moral doctrine to say that one, whose conduct is involved, may withhold evidence at hand, or evidence within his reach, which would tend to show what his conduct was, whether careful or negligent, and then rely upon and have the benefit of the mere presumption or inference that he was careful. If this were to be tolerated, then in every case of personal injury resulting in death, the plaintiff could refrain from calling any witnesses, no matter how numerous they might be, who knew or could testify as to the deceased's conduct at, or about the time of the injury, and rely upon the inference that he was exercising reasonable care for his own safety, and thereby avoid the necessity of proving, by direct testimony, an ultimate fact essential to his right to recover, or shift the burden of proof upon the defendant to show that he was, in fact, negligent.

The question here under consideration has been so frequently discussed by this court, and the rule has become so well settled, that a mere reference to the cases in which the doctrine has been pronounced is sufficient. See *Powers v. Iowa Central Ry. Co.*, 157 Iowa, 347; *Stark v. Ry. Co.*, 161 Iowa, 393, and cases therein cited.

In *Wilson v. Illinois Central Ry. Co.*, 150 Iowa, 33, this court said:

Ordinarily, where one is killed and there are no eyewitnesses of the transaction, the law will presume the person killed was in the exercise of ordinary care and doing nothing to jeopardize his life or limb. But this rule does not obtain where there are eyewitnesses.

This is the settled law of this state.

We are satisfied, from this whole record, that the plaintiff has failed to show that the deceased was free from negligence contributing to his injury at the time of the accident, and we

are further satisfied that the record so affirmatively shows negligence on the part of the deceased contributing to his injury that reasonable minds could not differ upon this question, and that this is fatal to plaintiff's right of recovery, and that the court, at the conclusion of plaintiff's testimony, should have sustained defendant's motion for a directed verdict.

The case is therefore reversed and remanded.—*Reversed and Remanded.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.