MARY MURRAY, Appellee, v. BROTHERHOOD OF AMERICAN YEOMEN, Appellant.

TRIAL: Taking Case from Jury—Hostile Motions for Directed Verdict—Effect. A disputed question of fact need not be submitted to the jury, when counsel, even impliedly, consents to a full and final disposition of the cause by the court. So held where, in a case presenting disputed questions of fact, both plaintiff and defendant moved for directed verdict, where the court then openly assumed the matter to be before him for full decision, and where complainant did not ask that any issue be submitted to the jury.

INSURANCE: Mutual Benefit—Action—Prior Existence of Disease—Evidence. The confidential report of an insurer's expert medical examiner, preliminary to the issuance of a policy of insurance, in which he recommended applicant as a fit subject for insurance and made no mention of any disease affecting the applicant, is quite persuasive proof that no disease existed.

INSURANCE: Mutual Benefit—Warranties and Representations—Rule of Construction. Statements and answers in an application for insurance will not be treated as technical *warranties*, even though repeatedly stated to be such, (a) when, from their very nature, they are necessarily expressions of opinions, and (b) when, elsewhere in the contract, there can be found reason

to suppose that such was not the clear understanding of the parties.  In such case, the warranty is simply of the applicant's good-faith opinion.  So held as to statements as to the physical condition of the insured, and as to the nonexistence of tubercular disease.

INSURANCE:  Mutual Benefit—Representations and Warranties—
4  Good Faith—Evidence.  On the issue of applicant's good faith in making representations in an application for insurance, evidence of what applicant had been told concerning the subject matter of the representation may be admissible.  *Held*, evidence competent that applicant, who had represented that her brother had died of lead poisoning, had been informed, prior to the making of the representation, that the doctors had so diagnosed the brother's malady.

*Appeal from Polk District Court.*—CHAS. A. DUDLEY, Judge.

MONDAY, JUNE 25, 1917.

ACTION by plaintiff as beneficiary on a benefit certificate issued by defendant to Jessie B. Murray, deceased. It was stipulated that, if plaintiff was entitled to recover at all, she was entitled to recover $726.64, with interest. There was a trial to a jury, and at the close of all the evidence, defendant moved for a directed verdict in its favor, and plaintiff moved for a verdict in her favor.  The defendant's motion was overruled and the plaintiff's sustained, and judgment rendered for the amount stipulated.  Defendant appeals.—*Affirmed.*

*John D. Denison, Jr.,* for appellant.

*Clark, Byers & Hutchinson,* for appellee.

PRESTON, J.—Defendant is a fraternal beneficiary association organized under the statute.  On April 15, 1914, deceased made and executed her application for a benefit certificate in defendant association.  On the 20th of the same month, a benefit certificate was issued to her, and on May 5 thereafter, she was duly initiated or adopted as a member, and received the certificate as issued.  A copy of

the application appears on the back of the certificate. She died of tuberculosis of the lungs March 29, 1915, in good standing in the association. No question is now made as to the cause of death. No controversy is made but that notice and proper claim was made for the amount due under the certificate. Defendant association rejected the claim and refused payment. The contentions of the defendant, as its counsel state them, are: First, that the answers of Jessie B. Murray to the questions propounded to her in her application were false and untrue, and constitute, each of them, a breach of warranty, which avoided the contract; second, that her death resulted from a disease or disability existing prior to the date of her benefit certificate; third, that the warranties contained in the certificate were breached by the insured, and the contract thereby rendered void. The errors assigned are that the court erred in admitting evidence regarding the ailment of her brother, which was communicated to deceased; that the court erred in holding that defendant was required to prove that deceased had knowledge of the falsity of the answers in her application, and erred in sustaining the motion of plaintiff, and overruling defendant's motion for a directed verdict.

The application contains, among other things, the following:

"I hereby warrant all my answers herein to be full, complete and true, without suppression, evasion or concealment, and I agree that this application with questions and answers thereto shall be copied on the certificate to be issued hereon, and that such certificate and application, together with the constitution and by-laws now or hereafter in force, shall form the contract between me and the Brotherhood of American Yeomen, and that such contract shall bind me and all my beneficiaries. * * * And I agree that any untrue answer to any question in Parts one

and two of this application shall immediately, without process, render the certificate issued thereon null and void."

The certificate provides:

"This certificate is issued and accepted upon the following warranties and conditions and agreements. That the statements in the application of said member, including answers in the medical examination, a copy of which appears upon the back hereof and which is hereby made a part of this agreement, are true in every particular, and shall be held to be strict warranties. That, if the application or any part thereof shall be found to be untrue, then this certificate shall be null and void; no claim resulting from disease or disability existing prior to the date hereof shall be valid against this association; I hereby warrant that I am in good health and that no change has occurred in my condition as set forth in my application, and I accept this benefit certificate, and agree to all the conditions therein contained at date of my adoption."

The list of questions in the application was headed by the words: "Warranties of applicant for membership, etc., in the Brotherhood of American Yeomen." The application contained questions upon family history, and her answer that her brother, aged 25 years, had died of lead poisoning, after one year's sickness.

Defendant pleaded affirmatively breach of warranty on the part of the insured because of the alleged falsity of her answers to certain of the questions. These are, in substance, that her statement that she was in good health was false and untrue, and so as to her consulting a physician within 10 years, and her answer that she had last been attended by a physician two years ago for two fractured ribs, and that there was a prompt recovery, for that she had been treated by physicians less than two years prior to the date of her application, and for an ailment other

than fractured ribs, and that she concealed the fact of such consultation, treatment, and ailment from the defendant; that she had consulted several physicians other than the one mentioned, and for ailments other than stated, within 10 years; that her answer to the question as to whether she had any disease of the throat, heart or lungs was false and untrue, for that, at said time, she was afflicted with disease of the lungs; that her statement that no blood relative, including brothers, had had consumption was false and untrue, for that a brother had had consumption; that her statement that she had never had any ailment, disease, injury or operation other than stated was false and untrue, in that, about one year prior to the date of her application, she was afflicted with symptoms of disease the same as those with which she was afflicted in her last illness. Defendant also alleged that the insured was not in good health at the time the certificate was signed by her and as warranted in the certificate, and that the certificate provided that no claim resulting from disease or disability existing prior to its date should be valid against the association, as to which last, defendant alleges that the insured died as the result of a disease, to wit, tuberculosis of the lungs (consumption), existing prior to the date of the certificate, May 5, 1914. The certificate provided that it should "not be valid unless delivered to applicant during applicant's good health." Defendant alleges that she was not in good health when the certificate was delivered. Because of certain matters appearing in the record, and particularly in regard to the question of the court's sustaining plaintiff's motion to direct a verdict, and whether deceased had knowledge of the alleged falsity of her answers, and whether her disease, tuberculosis of the lungs, developed before or after the beneficiary certificate became effective, which will be referred to later in the opinion, we think it advisable to refer to the

evidence somewhat in detail, but without attempting to give all of it.

A witness testifies that he was the medical attendant of deceased for about nine months, during which time she was confined to the house and prevented from attending to business for about seven and one-half months; that he treated her for pulmonary tuberculosis, which was the remote cause of her death; that the history and symptoms of the disease during its progress were typical.

Another medical witness testified that he had known deceased two years; had not treated her for any ailment prior to her last illness; attended her during her last illness for tuberculosis of the lungs; that the remote cause of death was tuberculosis. Another medical witness testified that he had met deceased at the sanatorium at Oakdale, where he was superintendent, and that this was June 25, 1914. Witness identified an exhibit as the record of deceased, and answers, to questions put to her by an attendant, that Dr. Peck was the sanatorium examiner in June, 1914; identified another exhibit as Dr. Peck's report on deceased to the sanatorium.

Dr. Peck testified that he examined deceased June 17, 1914, for admission to the sanatorium; that she was referred to him by Dr. Page, who brought her; that the exhibit identified by the prior witness was the record made by him; that witness examined her June 8, 1914; he found that she then had pulmonary tuberculosis; that she complained of tiring easily, was nervous, poor appetite and digestion, restless sleep, weak, afternoon fever, loss of weight, dry cough, shortness of breath, and so forth; that he diagnosed her case, basing his judgment on her symptoms and the history given by her, as pulmonary tuberculosis, and expressed his opinion that she had had it for years; says that she told him she had a similar attack the previous year, and had gone to Nebraska for a vacation; that de-

ceased then told him she had a brother who died from tuberculosis, three years previous.

As before shown, deceased stated in her application that her brother had died of lead poisoning; and it should be said here that she had been informed, prior to her giving such answer, that a doctor had pronounced his disease lead poisoning, but that thereafter, and before she told Dr. Peck that her brother had died of tuberculosis, she had been so informed.

Continuing the testimony of Dr. Peck, he says further that deceased told him in the conversation before mentioned that she had had a long-drawn-out attack of typhoid fever five years previous; witness says he found definite physical signs of tuberculosis in the lungs, and diagnosed her case as tuberculosis on June 8th; that she had been tubercular for years. He says, however, that the condition mentioned was not necessarily present all the time in the lungs; that if Dr. Mountain (whose testimony will be referred to later) found her normal on April 15, 1914, then there was no tuberculosis there. Witness gives other symptoms and tests made by him, and says she did not have the acute, rapidly developing type, but that she had chronic tuberculosis. He says, however, that a careful physical examination might be made in April and no symptoms discovered, and later, the symptoms might be found in June; that chronic tuberculosis has a usual run of several years before producing death. He says that, in his judgment, deceased was afflicted with tuberculosis or consumption on May 5, 1914, and immediately preceding that day.

At this point, we may as well refer to the rebuttal testimony of Dr. Peck in regard to a conversation between him and the plaintiff, who testified to the conversation. The plaintiff testified that, the day before deceased went to Oakdale, witness went with her to see Dr. Peck, and says:

"I asked him what was the matter. He said it was

lung trouble. I said, 'Doctor, how did that come? She was examined just in April for the Yeoman Lodge, and she passed an examination of good health then.' 'Well,' he says, 'her lungs—she was not far enough advanced, not even two weeks ago, that you could tell,' he says, 'that there was anything wrong with her,' and he says, 'it is hard to tell now * * * for it is just the very starting of it.'"

In rebuttal, Dr. Peck was asked if he so stated to Mrs. Murray, and answered:

"A. I had some conversation with her; yes, ·sir. Q. Will you tell the jury whether or not you make those statements to Mrs. Murray? A. I cannot recall the· words used in talking to her. Q. Did you tell her the substance of that? A. Yes, sir."

We have been compelled to go to the transcript as to this testimony, because of a dispute between counsel, but find that appellee's additional abstract is substantially correct.

· Dr. Wertz, testifying for defendant, states that he treated deceased about April 24, 1914, for catarrhal inflammation of the membranes of the nose and pharynx; that she consulted him at that time for headache, recurrent nose· bleed, for two months following a cold; said she had been afflicted in this way for two months.

Dr. Page says that he made a physical examination of deceased in December, 1911, and recalls that she was run down and took a vacation; saw her again in June, 1914, and diagnosed her trouble as being tubercular, and referred her to Dr. Peck; she had a cough, and an examination of the lungs caused him to decide she had tuberculosis; saw her again June 16, 1914; her case was further·advanced; saw her again in July, 1914; case progressing more rapidly than in June; told her in June what her trouble was. Dr. Leir says he treated the brother of deceased in the fall of

1911, and that the patient died in September; the cause of his death was tuberculosis of the lungs; lead poisoning runs a different course from tuberculosis; and witness describes the difference. Certificate of death recites that the brother died of tuberculosis of the lungs.

The stenographer in the office of the superintendent of the sanatorium says that, on June 24, 1914, she made the official record for each patient; produces Exhibit 6, and says her recollection is that she obtained the information appearing therein from deceased, and it recites, among other things, that a brother died of tuberculosis, and gives her age, weight, height, etc. Witness also identified Exhibit 7 as the paper brought by deceased from Dr. Peck. The first part of this, signed by deceased, contains nothing material to the issue; it simply agrees, in substance, to abide by the rules of the institution, and gives the time of her residence in Iowa. Attached to this, or as a part of it, is what purports to be the applicant's history, made out by Dr. Peck. Among other things in this report are the following questions and answers:

"Unable to do usual work since when? Just quit her office; past two months has gone home at night 'all in.' Similar attack a year ago; cough first began two months ago; expectoration began, Slgt. am. sputa; sputum not examined; amt. 24 hrs. Slgt. Tubercle bacilli present? None Exam. Applicant ever spit blood? No. Ever have chills, and when last? Yesterday. Highest and lowest afternoon temperature during last seven days, 99.3–99.8; Applicant has not had night sweats. Any enlarged lymphatic glands, and where? Yes, Cerv. Applicant has never had persistent hoarseness or huskiness; urinalysis presents nothing abnormal; previous illnesses, typhoid July, 1909, sick two months; three broken ribs and pleurisy; brother died three years ago with tuberculosis."

Another page of Exhibit 7 is filled out by the sanatorium examiner and shows, in part:

"Temperature 101 at 5:30 P. M. that date; pulse 104; respiration 24; normal weight 120; present weight 102¼ lbs.; appetite, none; voice, Sl. husky; cough not troublesome; no pain; fair strength; no tenderness or disease of bowels; menses more scanty past two months; no other disease present or other organs involved; constitutional conditions and general appearance, fair; applicant in moderately advanced condition of disease."

The printed application states that the sanatorium is in no sense to be considered a consumptive's home, and that it is an institution where patients in the first stage of pulmonary tuberculosis can be sent with the hope of cure, and so forth.

Dr. Mountain, the examining physician for the local lodge of defendant of which deceased was a member, testified that he signed the confidential report of medical examiner April 15, 1914; that he was acquainted with deceased and first learned she was sick several months after signing her benefit certificate; learned she had tuberculosis about the time of her death; that the statements above his signature in the confidential report are true. From this confidential report of the medical examiner, Dr. Mountain, it appears that, on the "15th day of April, 1914, deceased was 5 feet 4 inches in height, and she weighed 115 pounds, and her chest measure, forced inspiration, 28 inches; forced expiration 31 inches, and a waist measure of 24 inches and a temperature of 98, and her heart action was clear, regular and normal; there was no murmur or enlargement of the heart, and her pulse rate sitting was 72 and standing 80. Under No. 4, 'Examination of lungs,' he stated that her respiration was full and uniform throughout the lungs, and there was a freedom from unusual sounds throughout the lungs; that the percussion was normal throughout each

lung; and that there was no disease of the throat or lung, and there was no evidence of any disease of the brain or nervous system, and that the applicant had not had any disease or disorders affecting her present health."

Attached to this report is the following certificate of Dr. Mountain:

"Remarks......I hereby certify that I have carefully examined Jessie B. Murray in private, this 15th day of 4, 1914; and that I have carefully reviewed this application for $1,000 on applicant's life; that all answers to questions in Part 2 are in my handwriting and are exactly as made by applicant, and all answers contained in Part 3 are in my handwriting; and that applicant signed the said Part 2 in my presence. I recommend this applicant be accepted. Are you a commissioned examiner for this society?......Dated at D. M. 4—15—1914. Dr. E. B. Mountain."

The witness also testified that he first learned that deceased was sick several months after signing her benefit certificate; learned, at about the time of her death, that she had tuberculosis.

The secretary of the local lodge testifies that deceased attended a Yeoman dance about December, 1914.

Dr. Foulk, testifying for plaintiff, says that he was the medical adviser of deceased in the latter part of her lifetime; that, between December, 1911, and June, 1914, she called at his office 10 or 12 times; that he treated her for grippe, cold, constipation, headache,—different things like that; that he saw her about April or May, 1914. He was suspicious of her lungs and told her to go and see Dr. Peck; that she should get out into the open air; that, prior to the last named date, her health was reasonably good; that when he sent her to Dr. Peck was the first time he suspected tuberculosis, and that it was about a month previous to June 8, 1914, when he saw her and told her to go

and see Dr. Peck; and at that time, he examined her lungs
and found a dull area, and she had a little temperature,
and she gave a history of having lost weight; that the cold
or grippe which he mentioned had nothing to do with the
consumption that caused her death; that she came to his
office about a month before she went to Oakdale, and had
a little fever and a little cold; that he sent her home and
told her to come back in a few days; that she did so, and
had not got rid of her cold, and that this cold he thought
developed acute consumption; he testified that he would
say tuberculosis could develop in an interval of 48 hours;
does not remember anything in respect to fractured ribs;
never knew she had any ribs broken.

Dr. Watts, dentist, testified that deceased worked in
his office from 2 to 4 years; put in lots of time; was there
early in the morning; worked frequently from 8:00 to 6:00,
sometimes later; always ready to attend to business; was
well; did not recall that she was out of the office for six
weeks or two months at any time that he was at home, and
while he was away in the summer, she worked just the
same; heard no complaints of any headaches prior to April,
1914.

Dr. Cornell, a dentist, in Dr. Watts' office two years,
beginning May 1, 1913; saw deceased every day; she was
usually the first one of the girls to reach the office in the
morning; describes her duties, and says she was on her
feet practically all the time, and was there from about 8:00
in the morning to 6:00 or later in the evening; did not
remember that she lost any time aside from the vacation
she took; he took no vacation and was there every day;
knew of her consulting Dr. Peck in June, 1914; noticed a
change in her physical condition about a month before that
time; never knew of her being ill at all up to the time of
her leaving the office; about a month prior to June 8, 1914.

she began to gradually lose strength; appeared weary, needed a vacation.

Plaintiff, the mother of deceased, testified that deceased worked every day, long hours; that she did not complain in the two weeks preceding June 8, 1914, of being tired and nervous, nor of having any fever, nor of being restless at night, nor that she was losing weight or had any headache; that she never noticed that her daughter had any cough—she never complained of any cough; that deceased lived at home; was in good health when she joined the Yeomen; worked right up to the time she went to Oakdale, except a week; first noticed her health failing along towards June; wanted her to take a vacation; never knew her to be sick except for little complaints; several years before she joined the Yeomen she had an accident and complained of a pain in her side; thought her ribs were broken; when she had the trouble with her ribs, she treated herself; she made a very prompt recovery, and did not have Dr. Foulk during this sickness; knew of no one treating her in July of 1909; she was living at home at that time; never knew deceased had pleurisy; deceased never had anything like typhoid fever; went with deceased to see Dr. Peck the day before she went to Oakdale; did not know deceased was coming home tired for two months prior to June 17, 1914, nor that she had had a similar attack the year before; she was away 6 or 7 days on her vacation in 1913; deceased did not complain in the few weeks preceding June 8, 1914; did not know she had lost weight; she didn't complain of headaches; never noticed her having any cough; deceased went to Nebraska after she came home from Oakdale, the same place to which she had gone the year before, where some relatives live; she went August 1st, came back Thanksgiving time, stayed two weeks and returned to Nebraska; witness went out and brought her home in February, 1915; deceased was greatly improved at Thanksgiving time

(1914) ; had increased in weight; gained 24 pounds while in Nebraska on a ranch; felt better; she went to Oakdale June 24, 1914, and stayed nearly three weeks; she went to Yeoman dance in December, 1914; was feeling fine.

The father gave similar testimony, but not so much in detail. Another witness testified that he was acquainted with deceased; never knew of her being sick until her last sickness; when he saw her, she did not look or act sick.

Such, in brief and in a general way, is the testimony. There may be some other circumstances to be referred to in the discussion of the different points.

1. Appellant contends that the statements by deceased in the application should be construed as strict warranties, while appellee says that they should be construed as representations. Counsel for appellant have been very industrious in the citation of authorities on this proposition, and have very carefully presented their theory on that point, as has counsel for appellee. This is the point most strongly relied upon by appellant for a reversal. He urges strenuously that, if her statements are warranties, then defendant's motion for a directed verdict should have been sustained, and that the case should be reversed because it was overruled. Some other questions, such as the admission of testimony, depend upon the determination of this point. There is a question of practice that should be first noticed. We have stated that both plaintiff and defendant filed motions for a directed verdict, the defendant's being overruled and plaintiff's sustained. Appellant has assigned error that there was a conflict in the testimony at some points, and that, after the court had determined that defendant's motion for a directed verdict was not well taken, the case should have been submitted to the jury, and that the court erred in sustaining plaintiff's motion for a verdict. There is but little argument by ap-

1. TRIAL: taking case from jury: hostile motions for directed verdicts: effect.

pellant on this point except in the reply argument. We are inclined to the view that there was some conflict in the testimony and perhaps enough to require submission of the case to the jury as to some questions, were it not for the state of the record. In some jurisdictions, it is the rule that, where both parties make a motion for a directed verdict, all questions become mixed questions of law and fact for the court, and that there is no question for the jury The general rule in Iowa seems to be the other way, but with some exceptions, as where both sides of the case either expressly or impliedly consent to a disposition of the case by the court. We think the instant case comes within the Iowa cases holding that the court may properly dispose of the case without submitting it to the jury. The trial court was of opinion that the statements of deceased were not strict warranties. It appears that, in ruling on these motions, the trial court said, substantially, that the two motions presented a serious legal question as to the knowledge of deceased in regard to the representations and their alleged falsity, and that there was some doubt in his mind whether, if the defendant had not made its motion, he would have submitted the question to the jury, to the end that the question which he thought was about the only serious question of fact in the case might have been determined by the jury, and said:    .

"But if I am wrong about this matter, in view of the motion which has been made, and the question is submitted to the Supreme Court, the appellate court can make final disposition of it."

The court then went on to say that he did not believe that deceased, to her knowledge, was affected with tuberculosis at the time she signed her application, or at the time of the delivery of her certificate, and that, if her brother died of tuberculosis of the lungs, she did not know

it at the time of taking out her insurance with the defendant association.  The court then said:

"I think these questions are all squarely presented, so that either party now can have these reviewed by the Supreme Court just as well as if I should submit it to the jury upon instructions."

Thereupon, the court overruled the motion of the defendant, and sustained the motion of the plaintiff for a directed verdict for the sum of $755.  After the court had made the statement that, if he was wrong about the matter and the question is submitted to the Supreme Court, the appellate court can make final disposition of it, and that the questions could be reviewed by the Supreme Court just as well as if the case was submitted to the jury upon instructions, the defendant made no objection to the disposition of the case in this manner, and made no request that the case should be submitted to the jury.  Furthermore, in this court, counsel for appellant argues strenuously, and, as said, makes it his principal ground for reversal, that a proper construction of the certificate and the application and the statements of deceased is that they are warranties, and that under the evidence there should have been a directed verdict for the defendant.  At one place in the argument, appellant says:

"The sole question, as I conceive it, is, did the defendant establish any or all of its defenses by such evidence as required the court under the Iowa decisions to direct verdict in its behalf.  In considering that question, the trial court was manifestly in error when he injected the element of knowledge and bad faith and laid the proof of these upon the defendant as a condition required before its defense could be established, and his opinion in directing verdict shows that the failure of the defendant to establish bad faith, knowledge, etc., on the part of Jessie Murray was the reason underlying his action in that respect."

In the latter part of the above statement, counsel for appellant seems to concede that there was a failure of de-' fendant to establish bad faith, knowledge, etc.    Counsel concedes, however, in the reply argument, that the burden of establishing the various defenses alleged by the defendant clearly rests upon it.    Again, counsel says that defendant's motion for a directed verdict is based upon the proposition that one or more of its defenses are established as a matter of law, and in such case, nothing was left for the court to do but direct a verdict for the defendant; and they cite here *Sanderson v. Chicago, M. & St. P. R. Co.*, 167 Iowa 90, holding that the facts about which there is controversy must be submitted to and determined by the jury; when the evidence of the existence or non-existence of the facts is such that honest minds, searching for the truth, fairly and dispassionately weighing the evidence, might differ as to the existence or non-existence of the ultimate fact sought to be established by the evidence.    This, of course, is the ordinary rule, but the question here is whether, under this record, the defendant did not consent to a disposition of the case by the court, or waive the question of submitting it to the jury; and as to this proposition, appellant cites *German Savings Bank v. Bates Addition Imp. Co.*, 111 Iowa 432.    But in that case it appears, and the court so says, that the parties never agreed to waive a jury and to submit the issue of fact to the court, and that neither was willing, as against the motion of the other, to waive a jury and to submit this difference to the court; but each was impliedly asking, as against the other, that this difference, which it was the province of the jury to determine, should be submitted to the jury, so that there was nothing in that case except the two motions, one against the other, and this did not of itself show that the parties consented that the trial court should pass upon all questions. .But there is more than that in the instant case, and we think,

under this record, that this case is ruled at this point by *Gray v. Central Minn. Immigration Co.*, 127 Iowa 560, 562; *Wells v. Western Union Tel. Co.*, 144 Iowa 605, 624, and cases; *Battis v. McCord*, 70 Iowa 46.

It is very clear to us from the evidence before set out that there was abundant evidence to sustain a verdict for plaintiff, had the case been submitted to the jury, and it had so found. Appellee does not claim that, if there is not sufficient evidence to support a verdict of the jury in her favor, the case should not be reversed on appeal. Appellee contends that this and nothing more was the holding in *First National Bank v. Mount Pleasant Milling Co.*, 103 Iowa 518–524, cited by appellant. It is our conclusion that there was no error at this point.

2. The next question is whether the statements of deceased should be considered as strict warranties, as contended by appellant, or representations, as appellee contends. The principal contention by appellant, as to her statements, at this point, is as to whether deceased had tuberculosis, or consumption, at the time of her statements, or when her certificate became effective; and there is some argument on the point whether, considering her statements as representations, she had knowledge thereof and acted in bad faith. Some other alleged false statements are said to have been made which constitute a breach. But as to these last, plaintiff's evidence was such, some of it direct and some of it circumstantial, that the trial court was justified in finding that they were of minor complaints, such as cold and the like, and that she had not had typhoid fever and some of the other things relied on.

The evidence has already been set out at considerable length, and, without repeating it here, there was ample evidence to sustain the finding of the trial court that, although deceased died of tuberculosis of the

2. INSURANCE: mutual benefit: action: prior existence of disease: evidence.

lungs, she did not have that disease on April 15, or May 5, 1914. And the evidence is abundantly sufficient to show that, even though she had the disease prior· to these days, she did not know it, and did not act in bad faith in making her statements as to her physical condition in that regard. In this connection, it may be remarked that the confidential report of defendant's medical examiner, Dr. Mountain, before set out, is significant. It will be noted that, just before the certificate, under the title "Remarks," a space for answers is left blank, indicating, it would seem, that the examiner found nothing to indicate that the applicant was not in good physical condition. From this. and from the fact of his examination and the making of the certificate, as said in *New York Life Ins. Co. v. Moats*, 207 Fed. 481, 485 (C. C. A. 1913) :

"It may be inferred that the medical examiner, after having made a careful examination of the applicant, as a representative of the company skilled in the detection of disorder, found no sign or evidence of derangement of the brain or nervous ·system; that nothing in the appearance, speech or manner of the applicant gave to the medical examiner any impression not before expressed .in his report, or which might influence the home office .in its estimate of the risk. In other words, he had, as an expert representa-· tive of the company, and as required by his instructions, given in his report a pen picture of the applicant as he presented himself to the examiner, and this pen picture was favorable to the applicant as an insurable risk. It was plainly upon the examination and report of this skilled expert of the company that the character of .the risk was finally and mainly determined by the company, and not wholly upon the answers and representations of ·the applicant himself; and particularly must this be so. where the inquiry relates to the brain or nervous system of the applicant, wherein a physician and skilled examiner and ob-

server is often a better judge of the physical and mental condition of the applicant than the applicant himself."

This language is applicable to the instant case, and, as said, the defendant relied, in part at least, upon the judgment of Dr. Mountain. Though not cited by either party, see, also, Code Section 1812; *Weimer v. Economic Life Assn.*, 108 Iowa 451; *Brown v. Modern Woodmen*, 115 Iowa 450, as bearing on this point. It has been held, in some of our prior cases, that the section cited does not apply to mutual benefit fraternal orders such as this. Some members of the court think otherwise, but the point is not raised in this case or determined.

Dr. Peck, testifying for defendant, stated that, if Dr. Mountain found deceased in the condition as stated in the confidential report, then, on that date, there was no tuberculosis there, but that it developed thereafter and before June 8th. If Dr. Mountain, from the character of the examination made by him, was unable to discover any symptoms of tuberculosis or any other disease, surely deceased, inexperienced in such matters, could not be expected to know of its presence, and much less would a court or jury be justified in finding that she did not act in good faith in stating her condition. We do not overlook the fact that there is other evidence on behalf of defendant that the deceased had the disease prior to the dates mentioned; but, under the entire record, the finding of the trial court is sustained.

3. Appellant contends, and cites a

3. INSURANCE: mutual benefit: warranties and representations: rule of construction.

large number of authorities to the proposition, that, where a party to a contract binds himself to the strict truth of his statements, or answers, in such contract, and warrants the truth of his said statements and answers, the only question, where breach of warranty is alleged as a defense, in an action on such contract, is as to the truth

of the answers and statements so made and warranted. And appellant says that the element of knowledge is excluded where a contract of warranty is under consideration. Much of appellant's argument at this point is based upon the assumption that the statements and answers of deceased in the instant case were and are warranties. We do not understand appellee to dispute many of these propositions, but, as said, she contends that they should be treated as representations, and that, this being so, the question as to the knowledge of deceased is material.

In view of the length of the opinion, caused by setting out the evidence at some length, we shall not attempt to review all, or any considerable number, of the cases. It would be an endless task to do so. Furthermore, we think the rule is well settled in this jurisdiction, so that we shall refer to a few of the cases and content ourselves with the citation of others.

In *Owen v. Metropolitan Life Ins. Co.*, (N. J.) 67 Atl. 25, the court said:

"The declaration in Paragraph 2 of the application, to the effect that the applicant had never had disease of the heart, an obscure disease, concerning which the insurer should know that the applicant could not have certain knowledge saving as he might be told by a physician or other expert, is properly to be construed as a warranty only of the bona fide belief and opinion of the applicant. *Henn v. Metropolitan Life Ins. Co.*, 67 N. J. Law 310 (51 Atl. 689); *Dimick v. Metropolitan Life Ins. Co.*, 69 N. J. Law 393 (55 Atl. 291, 62 L. R. A. 774). Since the case is devoid of evidence to show that Owen was apprised that he was suffering from heart disease, beyond the mere fact that he was so suffering, it certainly was not conclusively proved that his bona fide belief and opinion upon the subject were otherwise than as warranted, and so a verdict

could not properly be directed in favor of the defendant on this ground."

*Murphy v. National Trav. Ben. Assn.,* 179 Iowa 213, and *Teeple v. Fraternal Society,* 179 Iowa 65, published at about the time, or since the submission, of the present case, are in point. In the *Teeple* case, we said that it is now well settled that the use of the word "warrant" or "warranty" in the application or policy is of itself not conclusive upon the question whether, in view of the entire record, any given answer or statement of the insured is to be given technical effect as a warranty, rather than as a representation, and that the rule is universal that such statements will not be construed as warranties, if elsewhere in the contract there can be found reason to suppose that such was not the clear understanding of the parties; and that, where there is any doubt as to the construction, the court will lean against the one which imposes upon the assured the obligations of a warranty. And further, that, if the answer alleged to be a warranty is one which, from the very nature of the subject of inquiry, must necessarily be an expression of opinion, the warranty will not be held to extend further than to the good faith of the answer. Numerous cases are cited in the opinion in that case which sustain the propositions stated, among them some of our own recent cases. See, also, *Lakka v. Modern Brotherhood of Am.,* 163 Iowa 159; *Sargent v. Modern Brotherhood of Am.,* 148 Iowa 607, and *Daniel v. Modern Woodmen of Am.,* (Tex.) 118 S. W. 211.

Enough has been said to indicate that in this case the statements of deceased as to her physical condition, and particularly as to tubercular disease, were necessarily a matter of opinion. There is also some language in the application indicating that the defendant, in wording the form of its application, may not have intended the language to mean a strict warranty. At least the language

is such as to make it at least doubtful in meaning, and, under the authorities in such a case, a construction will be given favoring a representation rather than a warranty. Among these provisions, we notice the following: "I hereby warrant all answers herein to be full, complete, and true, without suppression, evasion, or concealment," etc. Had the language stopped with the word "true," appellant would have had a stronger case; although, under the authorities, even though the word "warrant" is used, it does not necessarily follow that a strict warranty is intended. But the words following the word "true" limit the preceding statement, and would naturally have referred more to representation than to warranty. Definitions for these words are found in Cyc.: "suppression," 37 Cyc. 611; "evasion," 16 Cyc. 817; and "concealment," 8 Cyc. 544. They mean, in a general way, to avoid by some device or strategy, or the concealment or intentional withholding of some fact which ought in good faith to be communicated.

There may be other reasons which might be given why the matters now in question should be considered as representations, but enough has been given to show that, under the authorities, they are not strict warranties. See further, at this point, *Murphy v. Assn.,* supra; *Reppond v. National Life Ins. Co.,* (Texas) 101 S. W. 786 (11 L. R. A. [N. S.] 981) ; *Lakka v. Brotherhood,* supra; 19 Cyc. 684, 812.

4. Treating, then, the statements of

4. INSURANCE: mutual benefit: representations and warranties: good faith: evidence.

deceased as representations, we think the evidence admitted, to the effect that, prior to the making of the application by deceased, she had been informed that the doctors had pronounced her brother's illness lead poisoning, was competent as bearing upon her good faith and knowledge as to the cause of her brother's death. Had the case gone to the jury, the court doubtless would, on its own mo-

tion, have limited it to that purpose, or given such an instruction, if asked by defendant. The court, in determining the case, seems to have so limited this evidence. Furthermore, appellee contends that, under the rule announced in *Wilkins v. Germania Fire Ins. Co.*, 57 Iowa 529, at 534, defendant has waived its exception to the admissibility of this evidence, by its motion to direct a verdict.

There may be some other matters argued; but those we have noticed cover all such, and are controlling. It follows, then, that the judgment of the district court ought to be, and it is,—*Affirmed.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.