EARL HIGH, Appellee, v. WATERLOO, CEDAR FALLS & NORTHERN
RAILWAY COMPANY, Appellant.

**RAILROADS:** Accidents at Crossings—Duty per se to "Stop." A
traveler, in approaching and going upon a known railroad crossing,
must do *everything* which a reasonably prudent and cautious person
would do under like circumstances. Record reviewed, and held that
the court could not say that plaintiff was under a duty, as a matter
of law, to *stop* his vehicle, as a precautionary matter, before going
upon a crossing, in addition to *looking* and *listening* for a train.

**NEGLIGENCE:** Contributory Negligence—Emergencies. A *jury* ques-
tion, and not a *law* question, is ordinarily presented on the issue
whether a party was guilty of contributory negligence in what he did,
when faced by a grave and sudden emergency.

**RAILROADS:** Accidents at Crossings—"Physical-Fact" Rule in re
Looking. Principle reaffirmed that a person will not be permitted
to say that he did not see an approaching train when the physical
facts are such that, had he looked, he *must* have seen. But record
relative to obstructions to the line of vision and to the problematical
speed of the approaching train reviewed, and held not to warrant ap-
plication of said principle.

**TRIAL:** Instructions—Abstract Rules of Law. Instructions which con-
cretely and correctly apply the law to the facts of the particular
case will not be condemned because they also contain abstract rules
of law which, however, are correct as such.

**TRIAL:** Course and Conduct—Instructions in re View of Premises.
An instruction to the effect that the jury had been permitted to view
the premises "that you might better understand and apply the testi-
mony," though unfortunately lacking in a further statement to the
effect that the jury must not thereby make themselves silent witnesses,
will, nevertheless, not be condemned as prejudicially erroneous when
no amplification is requested and when no showing whatever is made
that the jurors did become "silent witnesses."

**NEGLIGENCE:** Proximate Cause—Instructions. Instructions relative
to "proximate cause" may be all-sufficient, without literally em-
ploying such terms.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

OCTOBER 17, 1922

Rehearing Denied February 17, 1923.

Action for damages resulting from a collision at a crossing, between a rig driven by the plaintiff and an engine operated by the defendant. Plaintiff recovered damages, and defendant appeals.—*Affirmed.*

*Barnes, Chamberlain & Hanzlik* and *Pickett, Swisher & Farwell,* for appellant.

*James E. Patterson* and *Rickel & Dennis,* for appellee.

Faville, J.—The appellant operates an electrically equipped interurban railway between the cities of Cedar Rapids and Waterloo. Cold Stream Avenue is a street in the outskirts of the city of Cedar Rapids. It extends east and west, and intersects the tracks of the appellant company practically at right angles. As one approaches this crossing, passing eastward on Cold Stream Avenue, it is necessary to pass through a cut that is about 1,000 feet in length, leaving a bank on the south side of Cold Stream Avenue approximately 20 feet in height. The point where it is first possible to see past the bank to the south is a little more than 21 feet from the west rail of appellant's tracks. At approximately the point where the bank breaks away to the east, there is located a tall pole, for the purpose of carrying the high-voltage lines across Cold Stream Avenue. This pole is approximately 13 inches in diameter, and is placed 21 feet and 8 inches west of the west rail. There is also a pole near here, with a wide signboard bearing the words, "Station ½ mile." The ordinary poles upon which the trolley line of appellant is carried are also located on the west side of appellant's track, and are from five to eight feet west of the west rail. These poles are about 13 inches in diameter. The usual warning crossing sign is placed on the south side of Cold Stream Avenue, 300 feet west of the crossing. There was no automatic bell or other device for signaling the approach of a train. On the north side of the avenue, and west of the track, there is an orchard and farm buildings, and farther to the north, there is a curve in the railroad track. The traveled portion of Cold Stream.

Avenue at the place in controversy is about 16 to 18 feet in width, and the road slopes gradually from the traveled portion to each side. On the north side, near the railroad track, there is a quite well-defined ditch, and on the south side is a shallow ditch. The traveled portion of the track, at the time of the accident, was covered with cinders. At about 5 o'clock in the afternoon of the 13th of June, 1920, the appellee was driving eastward on Cold Stream Avenue, when he approached the crossing in question. He was driving a pony hitched to a light spring wagon. He was sitting on the right side of the seat, holding a little child about three years old on his left knee. His wife was seated beside him, carrying a baby on her lap. The evidence tends to show that he was driving at a walk, as he approached the crossing. Some of the witnesses described the gait as a ''dog trot,'' and testified that the speed was about that at which an ordinary horse would walk. The appellee testified that, as he passed the embankment at approximately the point where the high-tension line pole is located, 21 feet and 8 inches west of the west rail of the appellant's track, he looked southward, and at that point could and did see a distance of approximately 150 feet; that he neither saw nor heard any approaching engine; that he then turned and looked to the north, still continuing on his course; and that he looked to the south a second time, and then observed the appellant's engine within about 75 feet of the crossing; that his pony was at that time upon the crossing; and that, as he endeavored to get it across, the engine struck the rear wheel of his wagon, throwing him out, demolishing the rig, and causing the injuries complained of. The speed of the engine, as estimated by the witnesses, varies all the way from 15 miles per hour to 60 miles per hour. It was an electric freight engine, without any train attached, and was not running on any regularly scheduled time. It is appellee's contention that no warning signals were given by either whistle or bell.

I. It is urged that appellee was guilty of contributory negligence as a matter of law, and that the court should have sustained appellant's motion for a directed verdict. The ap-

1. RAILROADS: accidents at crossings: duty perse to "stop."

pellee approached a known dangerous crossing, at about five o'clock in the afternoon on a day in midsummer. He was driving a gentle pony. It is contended by appellant that the "stop rule" should apply in the instant case; that it was not enough for the appellee to have looked and listened for a train, even if he did so, as he approached the crossing; that the situation and attendant circumstances were such that he was guilty of negligence as a matter of law, in not also stopping his pony before passing upon the appellant's tracks.

A person approaching a railway crossing is bound to know that he is approaching a dangerous place. As one has laconically said, "It is always train time at any railroad crossing." To be free from negligence, one must exercise the degree of care and caution that a man of ordinary care and prudence would exercise under the same or similar circumstances.

In *Hinken v. Iowa Cent. R. Co.,* 97 Iowa 603, we said:

"We have iterated and reiterated the doctrine that a railway track is always a place of danger, and that it is the duty of one about to cross it, even in the absence of any special warnings or signals on the part of those in charge of the train, to use his senses in order to avoid injury."

See, also, *Swanger v. Chicago, M. & St. P. R. Co.,* 132 Iowa 32.

In *Schaefert v. Chicago, M. & St. P. R. Co.,* 62 Iowa 624, *Nixon v. Chicago, R. I. & P. R. Co.,* 84 Iowa 331, *Banning v. Chicago, R. I. & P. R. Co.,* 89 Iowa 74, *Moore v. Chicago, St. P. & K. C. R. Co.,* 102 Iowa 595, *Wilson v. Illinois Cent. R. Co.,* 150 Iowa 33, and many similar cases, we have recognized that, under certain circumstances and conditions, which of necessity vary greatly in the different cases, a duty may rest upon one about to cross a railway track to not only look and listen, but likewise to stop before venturing upon the crossing. The true test for every case is whether or not, under all the existing circumstances, the person approaching a railway crossing, and about to cross, has exercised the degree of care and caution which a person of ordinary care and prudence would have exercised under the circumstances. Ordinarily, that question is peculiarly one for a jury. Cases may arise where, under the proven facts,

the person injured has so failed to act as a man of ordinary care and prudence that the court must hold, as a matter of law, that he has been guilty of contributory negligence. One approaching such a place of danger must exercise his senses; he must look for an approaching train; he must listen for the warning signals which, when properly given, betoken danger. He must do *all* the acts and things that a man of reasonable care and caution would do at the time and place. Under certain circumstances, it may be negligence for him not to stop, in order to listen for a train. The character of the vehicle which is being driven may make a material difference on the question of negligence in failing to stop. Obviously, one driving an automobile, under control, can more readily decrease or increase the speed of the vehicle than can one driving a team of horses. We are not disposed to adopt a hard and fast rule, and declare that a duty rests upon all persons approaching a railway track, even one where the view is partially obstructed, to invariably stop before attempting to effectuate a crossing.

In the instant case, the appellee approached the crossing in question in daylight. He was driving a pony hitched to a light spring wagon. The roadbed was covered with cinders. There is no evidence to warrant the conclusion that the noise made by the pony and wagon was such as to materially prevent the appellee from hearing the signals of an approaching train, if properly given. There was no diverting noise in the neighborhood. The appellee says that he was right at the edge of the trolley pole,—which is shown by the evidence to be 21 feet and 8 inches west of the west rail of the track,—at the time he first looked to the south. When asked how far he could see down the tracks to the south from that point, he said:

"It might have been 150 feet, and it might have been more, and might have been less."

Once he said that, when he looked, the pony's head was about 5 feet from the rail, and that he was sitting 15 to 17 feet from the west rail. He says that he looked "at the edge of the bank and the trolley pole both." He also says that, after one comes *past* the pole, the view is unobstructed for several hundred feet,—"about two or three blocks." He testified, "I looked far enough so I thought I was safe, in a southerly direction."

Other witnesses who saw the accident and who were familiar with the location, testified as to various distances that one could see down the tracks to the south, upon emerging from the cut. One witness, describing the situation, said:

"The horse would probably be on the track before you could see any distance down the track. The horse's head would come to the track. You could probably see down the track for 50 feet, or maybe 100 feet."

The driver of the school bus, who crosses the track every school day during the school year, said:

"One would have to be about 15 feet, I should judge, from the rail before he could see a train coming from the south."

This witness says that, in order to see a train, the head of a horse would be about 3 feet from the rail, and the driver would be about 15 feet. The party who lives immediately across Cold Stream Avenue to the north says that a horse's head would have to be on the track before one could get a clear vision down the track. He says:

"There is a line of trolley poles. You look at them just about that point, and they form just the same as a high board fence. You can't see down the track over a couple of hundred feet, just about at that point."

The appellant's contention is that it was not enough for the appellee to have looked to the south at that point where his line of vision cleared the embankment, and where the tall trolley pole and the line of other poles obstructed his view to the south. Appellant contends that between this point, 21 feet and 8 inches from the rail, and the track, there was sufficient unobstructed space so that, if appellee had looked, he must have seen the approaching engine. Appellant had photographs taken at a point approximately 19 feet west of the west rail. At this point, the line of vision to the south apparently cleared the embankment and the tall trolley pole. But this is not where appellee looked. The line of regular trolley poles, located 5 to 8 feet from the west rail, and placed 150 feet apart, however, formed some obstruction to the vision to the south, even from this point. It is claimed for the photographs that, at a distance of 19 feet from the rail, a motor can be discerned in the distance to the south upon the track 1,212 feet away. It is also

contended that, when one is standing 19 feet west of the west rail of the track, a motor car is plainly visible about 600 feet south of the crossing. No photograph appears to have been taken at the very spot where the appellee testified that he looked to the south at the trolley pole, 21 feet and 8 inches west of the track. Appellee's testimony is to the effect that at that point he looked, and saw down the track a distance of 150 feet or more to the south, and saw no approaching engine. No one disputes the fact that, as the appellee approached the railroad track from this point, he could see a greater distance south along the railroad track. Appellee admits that, when he got closer to the track, he could see "south a distance of two or three blocks;" and much is made by the appellant of this admission on the part of the appellee. Just how far to the south a man situated as the appellee was, could see an approaching car, when he looked at the point testified to by the appellee, 21 feet and 8 inches from the west rail of the track, does not definitely appear in the evidence. We do not think that the photographs offered in evidence demonstrate conclusively and certainly that the appellee *must* have seen the approaching car when he looked to the south at the point where he testified that his observation was made.

Having looked to the south at a point 21 feet and 8 inches from the rail, and having neither seen nor heard any approaching engine, the appellee then looked to the north, as it was his duty to do. He testified that thereafter he looked again to the south, and observed the approaching engine about 75 feet distant; and that at that time he was already upon the track. Must we say that, as a matter of law, the appellee was guilty of contributory negligence in failing to look to the south a second time sooner than he did, after having made his first observation in that direction? It was as much the appellee's duty to look to the north as it was to look to the south. He was required to look and listen for an approaching train from each direction. He is corroborated by other witnesses to the effect that he looked in both directions. He testified that he looked to the north, and thereafter a second time looked to the south. At that time, the pony was upon the crossing. If the pony was moving at the rate of 3 miles an hour, it would travel 4.4 feet per second; at 4 miles an hour, it would travel 5.87 feet per second; and at 5

miles an hour, 7.33 feet per second. The measurements show
that the appellee was sitting about 11 feet 3 inches from the
end of the shafts in which the pony was hitched. If the appellee
was 21 feet 8 inches from the west rail when he looked, then at
that time, the pony's head was approximately 10 feet from the
west rail. Allowing for the overhang of the engine, the rig
would have to move forward about 8 feet before there would
have been danger of a collision. So, if the pony was moving at
the rate of 3 miles an hour, the appellee had about 1.81 seconds
from the time he passed the trolley pole until the pony would
have been struck, in which to look to the north, and also to make
the second observation to the south. If the pony was moving
at the rate of 4 miles an hour, he would have had about 1.36
seconds; and if he was moving at the rate of 5 miles an hour,
he would have had about 1.09 seconds in which to have done this.
The foregoing are only approximations, but they illustrate the
situation somewhat.

We think it was a question for the jury to determine, under
these circumstances, whether the appellee acted as a man of
ordinary care and prudence in making this approach. If he
looked to the south at 21 feet and 8 inches from the track, and
then looked to the north, it was a question for the jury to say
whether he was negligent in not again looking to the south
sooner than he did.

In this connection, the fact must also not be overlooked that
appellee contends that no warning signals were given by the
approaching engine. The appellee had a right to expect the
appellant to obey the law in respect to such signals; and while
the failure to give the same (if appellant did so fail) did not
absolve the appellee from the duty of using reasonable care, it
is a circumstance proper to be considered by the jury in de-
termining whether appellee was guilty of negligence. *Dusold
v. Chicago G. W. R. Co.,* 162 Iowa 447; *Brose v. Chicago G. W.
R. Co.,* 185 Iowa 867; *Nichols v. Chicago, B. & Q. R. Co.,* 44
Colo. 501 (98 Pac. 808). We hold that the question of whether
or not appellee was guilty of contributory negligence was prop-
erly one for the determination of a jury, under all the facts and
circumstances of the case. See *Harper v. Barnard,* 99 Iowa 159;
*Moore v. Chicago, St. P. & K. C. R. Co.,* 102 Iowa 595; *Mack-*

*erall v. Omaha & St. L. R. Co.*, 111 Iowa 547; *Schulte v. Chicago, M. & St. P. R. Co.*, 114 Iowa 89, 94; *Lorenz v. Burlington, C. R. & N. R. Co.*, 115 Iowa 377; *Willfong v. Omaha & St. L. R. Co.*, 116 Iowa 548; *Bruggeman v. Illinois Cent. R. Co.*, 147 Iowa 187; *Case v. Chicago G. W. R. Co.*, 147 Iowa 747, 752; *Gray v. Chicago, R. I. & P. R. Co.*, 160 Iowa 1; *Platter v. Minneapolis & St. L. R. Co.*, 162 Iowa 142; *Dusold v. Chicago G. W. R. Co.*, supra; *Davitt v. Chicago G. W. R. Co.*, 164 Iowa 216; *Wolfe v. Chicago G. W. R. Co.*, 166 Iowa 506; *Rupener v. Cedar Rapids & I. C. R. & L. Co.*, 178 Iowa 615, 617.

II. It is contended, however, that the appellee could have avoided the collision, and that he was guilty of contributory negligence in failing so to do.

2. NEGLIGENCE: contributory negligence: emergencies.     This is not a case such as frequently—and all too frequently—arises, where the driver of a vehicle is knowingly endeavoring to cross a railway track ahead of a near-approaching train. The appellee was not endeavoring to "beat the train" to the crossing. The jury may well have found that the appellee drove somewhat leisurely upon the crossing, without seeing or hearing the engine until it was nearly upon him, and that then he whipped the horse with the lines, in an effort to increase the speed, just before the collision. He claims that he did not see the engine until it was nearly on him, and that the collision occurred almost instantly, "in less than a second" thereafter.

No rule can be laid down that must be a guide to conduct under such circumstances, except the general rule that one must act as a person of ordinary care and prudence. It was for the jury to say whether the appellee did so act after he discovered the approaching engine. Appellee might then have endeavored to stop the horse and back up. He might have tried to turn to one side. He might have tried to whip the horse and go ahead. As he described the situation, an emergency confronted him after he discovered the engine. It was for the jury to say whether or not he then acted as a reasonably careful man, under the circumstances. We cannot say that, as a matter of law, he was then bound to stop, or to turn aside, or to go ahead. As bearing on the question, see *Dusold v. Chicago G. W. R. Co.*, supra; *Butter-*

*field v. Chicago, R. I. & P. R. Co.*, 193 Iowa 323, and cases cited therein.

III.    Appellant contends that the appellee was guilty of con-
tributory negligence in not seeing the approaching engine, and
that, if he had looked, as claimed by him, he *must* have seen it in
ample time to have stopped before the collision.

3. RAILROADS: ac-
cidents at cross-
ings: "physical-
fact" rule *in re*
looking.

The claim at this point is that the "physical-
fact rule" applies; that the appellee's evidence
that he looked and did not see the engine is
contrary to the physical facts, and that it must be held that he
saw it, or that he did not look as claimed by him. The claim is
that the engine must have been within the range of vision of
the appellee when he first looked to the south. Whether it was
or not depends upon two things: the distance that appellee could
see to the south from the point of observation, and the speed of
the approaching engine; and there is no absolute certainty as
to either of these. If the engine was approaching at but 15
miles per hour, as contended by appellant, it must have been
nearer the crossing, and more probably within his range of
vision when appellee looked, than if it was moving at 60 miles
per hour, as contended by appellee. The speed at which the
engine was moving was an approximation. The distance to
which the appellee could see from the point where he made his
observation to the south was also an approximation. We cannot
say that, if the appellee had looked south at the point desig-
nated by him, the "physical facts" with respect to the topog-
raphy of the ground, the obstructions, and the location of the
engine, *conclusively* demonstrate that he *must* have seen the en-
gine at that time. We have no disposition to recede from the
"physical-fact" rule heretofore announced and recognized by
us; but we do not think that the evidence in the instant case
is so conclusive as to require us to hold, as a matter of law,
that the appellee did see the approaching engine. In this con-
nection, we have not overlooked the fact that there was evi-
dence in behalf of the appellant to the effect that the engine was
not capable of a speed in excess of 31 miles per hour when oper-
ated on parallel, and not to exceed 20 miles per hour when
operated on series. This evidence, however, was not conclusive
and binding upon the appellee. It was in the nature of an

opinion and an estimate by the witnesses for appellant, and was a proper matter for the consideration of the jury; but it cannot be said to be final and conclusive, as a matter of law. We think the question was properly for the jury.

IV. The appellant challenges various instructions given by the trial court. Standing separate and alone, some of the instructions attacked are justly subject to criticism; but under our well recognized and often announced rule, the instructions must be read as a whole, and when they are so read and construed, we think the case was fairly submitted to the jury.

4. TRIAL: instructions: abstract rules of law.

It is contended that Instruction No. 2 was erroneous because it merely announced an abstract rule of law in regard to contributory negligence. This is true; but the instruction as given was correct, and other instructions, and particularly Instruction No. 11, explained to the jury the particular duty resting upon the appellee, under the evidence in the case, in order that he might not be guilty of contributory negligence. When the instructions are read and considered as a whole, we think the court fairly submitted to the jury the question of contributory negligence.

It is complained that Instructions Nos. 3 and 4 are erroneous in that they refer to matters not involved in the case. We do not think they are subject to the criticism lodged against them. Instruction No. 3 explained to the jury the duty imposed by law upon the appellant in the giving of signals within the city limits. The instruction could have been more artistically drawn, and a portion of the same eliminated; but from the way it was given, no prejudice resulted to the appellant.

Instruction No. 4 might have been omitted entirely, under the evidence in the case; but appellant is in no position to complain of said instruction, as it was favorable to the appellant in all respects.

Instruction No. 5 was as follows:

"You have been taken, gentlemen, to view the scene of the accident. This was done that you might better understand and apply the testimony to the issues before you."

5. TRIAL: course and conduct: instructions in re view of premises.

This instruction should have been amplified. Where jurors are permitted to view the *locus in quo,* it is for the purpose of enabling them to more intelligently apply the testimony to the issues before them, and not to make themselves silent witnesses of any facts in the case. The case must be determined upon the evidence offered before the jury, and not upon the jurors' own observations of the premises. *Guinn v. Iowa & St. L. R. Co.,* 131 Iowa 683. Where a view of the premises is permitted, the jury should generally be instructed with regard to the law in such cases, and such instruction should generally include a caution that the jurors are not to consider their own observations as evidence, but that they must base their verdict solely upon the evidence offered in the case; and that the viewing of the premises is solely for the purpose of enabling them to more intelligently apply the testimony to the issues before them. In Instruction No. 5, the court told the jurors that they had been permitted to view the premises in order that they "might better understand and apply the testimony to the issues before them." It is urged that it was prejudicial error to give this instruction in this form, without including specifically a definite caution to the jurors that they should not consider their own observations as evidence in the case. There is no claim that the jury made any measurements or did anything by this observation except the very thing which the court, by its instruction, directed the jury to do, viz., to "better understand and apply the testimony." The appellant made no request for any more specific instruction to the jury on this subject. No prejudice resulted to the appellant by the instruction as given, or by the failure to incorporate therein a caution and admonition to the jurors to the effect that they should not consider their own observations as evidence. In *Keller v. Harrison,* 151 Iowa 320, we reviewed the cases on this subject, and said:

"Where the conclusion of the jury, as finally expressed in the verdict, must necessarily rest on evidence of conditions, conduct, and events preceding the view by many years, and all that could have been observed by them was the topography of the land in the neighborhood of the disputed lines and corners, and the trees and fences thereon, it would seem that no instructions

were needed to limit the consideration of what might be seen to a better understanding and application of the evidence adduced. To what other purpose might it have been put? An examination of this record affords no answer to this inquiry, and for that reason we are inclined to regard the omission to instruct as without prejudice.''

Objection is made to Instruction No. 10, on the question of speed. The instruction submitted to the jury the question as to whether or not the appellant was operating its car at a reasonable rate of speed, at the time of the accident. We think the instruction was correct. In submitting to the jury the determination of this question, the court told the jury that it was to be ascertained by it ''from all the facts and circumstances in evidence.''

Complaint is made of Instruction No. 12. In this instruction the court attempted to summarize the evidence in the case upon the plaintiff's theory. One ground of complaint is that the instruction told the jury, in effect, that:

''If the plaintiff looked first to the south, then to the north, and heard no bell, sound, or whistle blown, and failed to see any moving car on defendant's road and was struck on the crossing, that he could recover, provided his own negligence in no way contributed to the injury.''

The particular complaint made is that this instruction ignores the physical-fact rule; that it told the jury that the appellee could recover if he did not, in fact, see the approaching car or did not, in fact, hear a whistle or bell. It is argued that the question in the case at this point for the jury to determine was whether, under the physical facts, the appellee *must* have seen the approaching car, and whether the whistle or bell were in fact sounded,—not what the appellee may have failed to see or hear. The instruction is not happily worded; but in view of other instructions that were given, we do not think the jury was misled by the giving of Instruction No. 12. The court clearly defined to the jury the duty resting upon the appellee and the appellant, and instructed the jury to determine from the evidence in the case whether the appellee was guilty of contributory negligence, and whether the appellant was guilty of negligence. The duty resting upon each was clearly pointed

out in the instructions. No requests were made by the appellant in regard to this subject-matter. We would not be justified, upon the record, in reversing the case because of the giving of this instruction.

It is urged that the court failed to instruct on the question of proximate cause. The words ''proximate cause'' do not appear in the instructions; but the court told the jury, in effect,

6. NEGLIGENCE: that appellee could only recover if struck and
proximate injured ''in consequence'' of appellant's negligence. The jury could not have been misled as to the question of proximate cause, under the instructions given.

Other errors urged by the appellant have been fully considered by us, and are without merit. We find no error of law in the record, requiring a reversal of the case. It was essentially a question for the jury to determine whether or not the appellee was guilty of contributory negligence, and whether or not the appellant was guilty of negligence. These questions were fairly submitted to the jury by the court. We cannot sit as triers of fact questions in cases of this kind.

We find no error of law in the record, requiring a reversal of the case. The judgment appealed from must, therefore, be—
*Affirmed.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.