MARIE STARK, Administratrix, Appellee, v. THE TABOR & NORTHERN R. R. Co., Appellant.

**Railroads:** PERSONAL INJURY: CONTRIBUTORY NEGLIGENCE: EVIDENCE.
1  A railway employee is required to use his senses of sight and hearing, when crossing the tracks of another company, to avoid injury from a passing train on that road; especially when he has been warned of the approach of a train. And where an employee alighted from his own train, after being warned of the approach of a train on the other road, and was either unable to avoid collision therewith, or went upon the track in front of the train regardless of the warning, he was guilty of contributory negligence as a matter of law.

**Same.** Where the deceased alighted from his own train in front of
2  another moving train on another railway, after being warned of its approach, the fact that as the train which struck him was moving slowly he might have thought it was standing still, and that it would not be moved without warning him, was not an excuse for his contributory negligence in going in front of the train after being warned of its approach, without looking to see whether it was moving or standing still.

**Same:** INSTINCT OF SELF-PRESERVATION. Where there was direct testi-
3  mony covering every interval from the time deceased left his own train until he was struck by the passing train and killed, and the entire evidence showed that he passed in front of the train which struck him after being warned of its approach, the presumption of care arising from the instinct of self-preservation will not obtain, to make the question of his contributory negligence one for the jury.

*Appeal from Mills District Court.*—HON O. D. WHEELER, Judge.

ACTION at law to recover damages for the death of Edward P. Stark, due to defendant's negligence in running a train against and over him. Trial to a jury, verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*Gillilland & Logan,* for appellant.

*John Y. Stone* and *Genung & Genung,* for appellee.

DEEMER, J.—At the town of Malvern, in Mills county, the Chicago, Burlington & Quincy Railway Company has a station, depot grounds, and a stockyard. To the north of this station are the railway tracks; the first one being what is known as the Tabor & Northern track, immediately north of the depot, the next, the passing track, and the northernmost one being the main line track, running east and west. The defendant railway comes in with its train to the depot over what is known as the Tabor & Northern track, and there receives its passengers and freight and such cars as may be routed over its line. It has the right of way over its line. The line approaches the depot upon a grade from a bottom to south and west of the station. Some distance to the westward of the station is a county highway or street in the town of Malvern, and still west of that are the stockyards. The passing track, as the name implies, was used for passing trains, and this extended for quite a long distance, both east and west of the station. Plaintiff's intestate was head brakeman upon an extra freight train on the Chicago, Burlington & Quincy line, which was going west, and which, on the day in question, took the passing track in order to pass a passenger train due from the west not long after the freight train reached Malvern. This train was a long one, made up of fifty or sixty cars, and, in order to clear the street to the westward of the depot, it came into the station at a rapid rate of speed—the witnesses

say from twelve to fifteen miles per hour—ran on by until
it got a stop signal from the rear brakeman. As a matter
of fact, the way car, or caboose, was some little dis-
tance west of the highway or street when the train came to
a full stop. For any of the Chicago, Burlington & Quincy
Railroad Company's employées to get to the depot, it was
necessary for them to cross the Tabor & Northern track. The
deceased was head brakeman of the extra freight train, and
was riding in the engine when his train came into Malvern.
It was his first trip into Malvern, or at least his first trip with
the crew to which he then belonged, and, as we gather from
the record, he had had little or no experience as a brakeman.
About the time the extra freight swung onto the passing track,
Stark, the deceased, asked the engineer how long the train
would stop at Malvern, and was informed that it was likely
to be for some little time, as it would probably have to wait
for the passenger trains from the west, one of which was not
due for something like an hour. Stark then said that he
believed he would go back to the way car, or caboose, and eat;
"that he believed he would catch the way car." On account
of a hill to the west on the main line of the Chicago, Burling-
ton & Quincy Railroad, it was customary for heavy freight
trains westward bound to back out over the passing track to
the main line to take a run for this hill, and in so doing the
engine was stopped near the depot or station.

As this extra freight was running in onto the passing
track, a train belonging to the defendant was coming in on
its track from the west, headed for the depot. The two trains
passed near the stockyards, and as the
deceased jumped off the engine of the freight
train, as we must assume, for the purpose
stated to the engineer, he got upon the track
on which the Tabor & Northern train was approaching the
depot, was struck by that train, and died within a short time
after receiving his injuries. The Tabor & Northern engine
was pushing a box car, and had some cars to the rear. There

1. RAILROADS:
   personal in-
   jury: contrib-
   utory negli-
   gence: evidence.

was no watchman or lookout on this box car; but it was possible, on account of a curve in the track some distance to the west, to see if there was any one upon the street to the westward of the depot, and the testimony tended to show that all the defendant's employées were on the lookout to see if the track was clear near this point. The Tabor & Northern train was running at a speed of about four miles per hour at the time it struck the deceased, and a jury was justified in finding that neither the bell was rung nor the whistle sounded as it approached the street crossing or the depot. There was sufficient testimony to justify a jury in finding that defendant's employées were negligent in pushing a box car ahead of the engine without a lookout or watchman upon it, and in failing to ring the bell of the engine as it approached the street or highway crossing west of the depot. Indeed, it could not well have found otherwise than that defendant was negligent in pushing the box car in the manner it did. The real question in the case, and the one pressed in argument as a ground for a reversal of the judgment, is that deceased was guilty of negligence, as a matter of law, and that the verdict should have been set aside on this ground, if for no other. Appellant's counsel contend that deceased was a trespasser upon the track where he was struck, and that defendant owed him no duty, until he was seen by some of its employées. But this does not appear to be true. He was an employée of the Chicago, Burlington & Quincy Railroad, and the accident occurred within its yards. The Tabor & Northern track was owned, as we understand it, by the Chicago, Burlington & Quincy Railroad Company, and, although the Tabor & Northern Company was entitled to the right of way over the track, it was in the yards of the Chicago, Burlington & Quincy Railroad, and employées of that company had the right and it was their privilege to pass over the same in the performance of their duty. Appellee's counsel contend that Stark got off the train for the purpose of going back to the depot to get what are known as telegraphic clearance orders to be given

to the engineer.   The record does not sustain this contention; on the contrary, it appears beyond all question that he got off to go back to the way car to eat a lunch.   Any other conclusion is the merest surmise, not sustained by sufficient testimony to justify such a finding.   There is some conflict in the testimony as to the speed of the train at the time that Stark alighted; but the physical facts in the record, which cannot be doubted, clearly show that it must have been running at a speed of from eight to ten miles per hour.   Stark was struck at a point 357 feet west of the depot, and 262 feet west of the street to which we have referred, and at that point the distance between the north rail of the Tabor & Northern track and the south rail of the passing track was eight feet one inch.

There is some conflict in the testimony as to whether the freight train was running or had stopped at the time the deceased was struck; but here again the physical facts indicate that it must have been running and at a considerable rate of speed.   It makes little difference, however, in our opinion, which of the witnesses are correct on this proposition, as the decision must turn upon the testimony as to what deceased was doing just before he was struck.   We here set out all the material evidence bearing thereon.   We have already referred to the reasons why deceased got off the freight train, and we here quote from testimony of the engineer as to the manner of his getting off, and as to what was said to him at the time.

Q. I will ask you if you remember when Stark swung off the engine?   A. Yes. sir; I recollect him getting off.   Q. I will ask you if you said anything to him at that moment? A. I believe I told him to look out for the train coming down on that track.   Q. Did you call it the 'Tabor' train, or the train?   A. I don't think I said what train, only I think I said, 'Look out for the train coming on that track!'   Q. What did Stark say?   A. He said, 'Alright,' and looked down that way. Q. Then he swung off on the ground?   A. Yes, sir; that was the last I seen of him.   Q. What was the char-

acter of your tender as to being high or low behind? A. Possibly as high as the top of my head. Q. Could he have seen out at all except through the opening as he went out of the door? A. No, sir. Q. So you saw nothing of Stark from the time he went out through the door until the time you discovered him down there after the accident? A. No, sir; I did not see him. Q. What, if any, outcry did you hear anybody make very soon after Stark swung off on the ground? A. The fireman. Q. What did he say? A. He hollered or whistled at him; I forget which. He made some kind of warning. Q. To look out for what? A. For the train. Q. The Tabor & Northern train? A. He did not say what. Hold on a minute. He just hollered at him, made a noise, 'Halloo' or 'Look out!' I do not remember. I know he was making a noise, though. Q. Did Mr. Christie at that moment make any remark to you about Stark? What did he say, if anything? A. He said, 'I do not believe that man came out. It seems to me as though the train passed by.' He says, 'I did not see that man.'

The man Christie referred to in this testimony was the fireman on the engine, who was dead at the time of the trial. The only other testimony with reference to how the accident occurred was as follows:

. . . Saw a freight train pull in headed west, north of the depot. After this train stopped, I saw a man walking toward the depot on the Tabor & Northern track. The Tabor train was coming in very slowly, with an ordinary box car in front of the engine. I did not see Stark leave his engine or step on the track. I saw the train coming up behind him quiet and easy, and all he done when he first saw the train, he looked over his left shoulder, and threw up his hands and made a long leap and jumped with his head south, and the train wheels caught him by the foot. He threw his hands up and made a leap. It looked like he was walking in the center of the track. He was rolled over and dragged fifty or sixty feet. . . .

Am sure the Burlington freight had stopped before Stark was struck. The Tabor train came up behind him slowly, and he was walking fast, a rapid gait; but the train gained on him till it got up to him, and then he looked over his left shoulder and gave a fine, good leap, and did not quite clear the

track, and it caught him by the foot.  There was nothing to disturb him but the coming of the Tabor & Northern train. Everything was quiet, and as he walked up the track the train got just a little bit closer to him, and after a bit it caught him. I was afraid to holler at him for fear he would think his own men were hollering at him, and the train got him.  I said to myself, 'You will certainly clear the track.'  I thought I had no right to halloo, and I did not.

Still another said:

I was at the depot platform in Malvern the day a young man was killed in the yards by the Tabor train. . *. . I was looking straight west toward those cars, and I seen the man.  Q. You may tell the jury where you first saw this young man, Mr. Stark, before he was killed.  A. I was standing there, and I saw him standing there, and just as he turned around to go through that track he was right in the center of the track.  Q. Did you see him walking up the track?  A. No, sir; I saw him turn right there by the track.  He was facing east.  Q. You saw him turn and stop upon the track?  A. Yes, sir; he was turning toward the east, facing the depot, still walking in the center of the track.  He threw his hands up, right straight up, and just as he threw his hands up I saw the train hit him.  I did not see whether he tried to jump. The Tabor train was coming awful slow. . . .  Q. Did you make any statement to Mr. Gillilland as to what the big freight train was doing?  A. Well it was standing there as I seen it, but making no move after it pulled west of the depot there.  Q. You told him the big freight was standing in the yards when the Tabor & Northern train pulled down there and struck Stark?  A. No, sir; I said the freight train was still going when the Tabor & Northern was coming east, and the freight stopped just west of the crossing.  I say now that the freight was standing still when Stark was hit.  I first saw Stark when he was turning east into the Tabor & Northern tracks.  Q. How far was the car from him at that time?  A. I could not say exactly.  I know it hit him pretty quick.  Q. You can see the table at which the judge is sitting; was it further from him than that table is from you?  A. Well, I do not know.  I could not see behind him.  That train was coming slow.  He was coming towards the depot, but I saw him throw his hands

up.  Q.  We had a conversation at a little table in your room?
A.  Yes, sir; at a stand.  Q.  Did you not state to me that the
car was not further from him than your table where we sat
to the wall, four or five feet?  A.  I may have said that, too.  It
did not make much difference.  There was no sound or nothing.
Everything was quiet.  Of course, I know you said to me,
'Undoubtedly there was some bells ringing, and I could not
hear them for the noise of the other train.'  Q.  I asked you
if it was not the noise of the other train that made it so you
could not hear the bells.  A.  It may have been that.  I did not
hear any bells.

Another said:

I first saw the Tabor & Northern train that day standing
at the depot.  As soon as my train cleared so I could look across,
I saw it standing there.  I knew that Stark was somewhere on
the head end of the train.  The switch point where Stark was
struck is farther from the depot than from the stockyards.  I
found that Stark had been carried quite a distance, but made
no measurements, and could not tell how far.  The ground is
level where he was struck.  West of there it is a trifle steep, off
to the west where the Tabor & Northern comes in.  I think it
is uphill till you get to the crossing.  There was nothing to pre-
vent Stark from seeing the Tabor & Northern, if he had looked
that way.

Still another testified:

.  .  .  When the Tabor train pulled up and stopped,
I noticed an object.  Did not know it was a man until he raised
up.  I said, 'They have run over somebody,' and ran down
there.  I was the first man to him.  He was lying with his head
to the west, at the south side of the track, badly mangled up.
He asked twice if I thought he could live.  I told him he was
in pretty bad shape, and it was doubtful.  He did not seem to
realize what had hit him.  I asked him how in the world he
got under that train, and he said they told him 'to get off and
get,' and just as he said 'get' a pain struck him, and he stopped
speaking.  He was in great pain.  He was about 500 feet west
of the depot when he was struck.  Judging from the blood on
the rails, he was carried probably 100 feet.

The engineer of the Chicago, Burlington & Quincy Railroad gave the following testimony, additional to that already quoted:

We were running twelve to fifteen miles per hour when Stark swung off. I went back to the engineer's side to catch the signal when we would get in the clear. The engine was running itself at about fifteen miles per hour while I was looking for Stark. We had to clear the crossover west of the street, so that a train coming east could use it if they wished. I warned Stark about the Tabor & Northern train, because I knew that he was new in the service and not accustomed to railroading.

This is all the testimony bearing upon the matter as to how the accident really happened, and there are but two possible theories of the transaction. Stark either jumped off his train while it was running at from eight to fifteen miles an hour in front of the approaching Tabor & Northern train, of which he was warned by both the engineer and fireman of his own train, and when the Tabor & Northern train was so close that he could not avoid the impact of the train, or he got off his own train either while it was at rest or in motion, and, paying no attention to the warnings given him by his coemployées, deliberately went upon the tracks on which the Tabor & Northern train was approaching, without looking for the approach of the train of which he was warned, and either stopped in front of the oncoming train, or deliberately walked down the center of the track, entirely oblivious of the approaching train until he partially turned his head and noticed that it was upon him. No matter which of these conclusions may be adopted, it is very clear that deceased was guilty of contributory negligence, as a matter of law. Even an employée is bound to exercise his senses of sight and hearing to avoid the danger from passing trains, and this is especially true where, as in this case, he is warned of their approach. The accident must have occurred either because of the deceased's lack of experience, or because of his "foolhardiness" in taking chances on alighting from a train in

front of one approaching, of which he was warned, or because of his failure to look for the approach of the train of which he was advised. There were no circumstances calculated to divert his attention, and nothing appears in the record to excuse his negligence. The following cases support our conclusion: *Hinken v. Railroad Co.,* 97 Iowa, 603; *Wilson v. Railroad Co.,* 150 Iowa, 33; *Bryson v. Railroad Co.,* 89 Iowa, 677; *Buelow v. Railroad Co.,* 92 Iowa, 240; *Banning v. Railroad Co.,* 89 Iowa, 74; *Oliver v. Railroad Co.,* 122 Iowa, 217; *Hoffard v. Railroad Co.,* 138 Iowa, 543.

Counsel for appellee make some suggestion as to how the accident might have occurred but these inferences do not seem to be justified by the testimony. Indeed, in the face of this record, there is no room for any inference which will relieve the deceased from the consequences of his own negligence. He had no occasion to pass upon the Tabor & Northern track for any purpose, and he was not intending to cross over the same. His object was to get back to the way car, and this he could easily have done without going on the Tabor & Northern tracks. If he used them as a passageway, without paying any attention to his own safety, he was negligent.

Counsel for appellee say he was going back to the depot to get some train orders; but the testimony distinctly negatives this idea. Again, they suggest that he may have thought the Tabor & Northern train was standing still,

2. SAME.
because it was approaching him so slowly, and that he had the right to go upon the track and to assume that it would not be moved without warning him. That this would not excuse him is held in the *Bryson* case, *supra*. In addition to this, he was warned that the train was approaching and to look out for it. Had he exercised the degree of care required of him, he would have ascertained whether it was moving or standing still, and had he looked he either must have seen that it was moving, or, if he did not discover the fact, he was negligent in not doing so. The *Bryson* case is closely in point on this proposition. Again, it is said that his own train was

making so much noise and dust that he could not see the approach of the train which caught him; but, if this be true, he must have jumped from a rapidly moving train into the very face of a danger of which he was warned. But witnesses more than 300 feet from the place of accident had no difficulty in seeing the train and in noticing that it was moving, although they were looking almost directly down the track toward the approaching train.

Finally, they say that they are entitled to the benefit of the rule as to the presumption arising from the instincts of self-preservation.   This presumption does not arise where there is direct testimony as to the conduct of the party injured. The direct testimony covers practically every interval from the time the deceased concluded to leave his own train down to the time he was struck, and we do not think the presumption, even if it arose, as to a very short period of time, was sufficient to take the case to the jury. The trial court did not think so, for it did not instruct upon this point or direct the jury to consider it. Moreover, this presumption will not obtain, if the direct evidence or the physical facts show that the injured party was not in the exercise of the degree of care required of him when struck. At best, there was such a short period of time not covered by the testimony that no presumption can fairly arise that during this short period something occurred which would indicate that he used the degree of care required of him. This last proposition is, to our minds, the only debatable question in the case. But for reasons already stated, we do not think there is any room for a presumption which will relieve the deceased in view of the direct testimony relating to his conduct at and just before he received his injuries. That deceased did not pay any attention to the warnings given him, and that he did not look for the approach of the train, is established by eyewitnesses. The testimony shows a clear case of negligence on the part of defendant's employées; but it is equally clear, we think, that the deceased

*(margin note: 3. SAME: instinct of self-preservation.)*

was guilty of contributory negligence. The trial court should have sustained defendant's motion for a new trial, and, in failing to do so, there was error, which calls for a reversal.— *Reversed.*

WEAVER, C. J., and LADD, EVANS, GAYNOR, PRESTON, and WITHROW, JJ., concur.