VALERIA HITCHCOCK, Administratrix, Appellant, v. IOWA SOUTHERN UTILITIES COMPANY OF DELAWARE, Appellee.

No. 45676.

OCTOBER 27, 1942.

REHEARING DENIED APRIL 9, 1943.

Gilmore, Moon & Bannister, of Ottumwa, Cosson, Stevens & Cosson, of Des Moines, and Glenn R. Donaldson, of Kansas City, Missouri, for appellant.

McNett, Kuhns, McNett & Aiken, of Ottumwa, and Valentine & Valentine, of Centerville, for appellee.

STIGER, J.—This accident occurred about 10:00 o'clock on the morning of August 26, 1937, where primary highway No. 60, a north-and-south road, crosses the main and switch tracks of appellee's interurban railway at approximately right angles about five miles south of Albia. The switch track is south of the main track. Decedent was approaching the crossing from the south and appellee's train was approaching from the west. The day was warm, clear, and quiet and the pavement dry. The tracks of the Wabash Railroad Company run east and west about 510 feet south of appellee's tracks. The highway is straight and practically level for a distance of 700 feet south of the railroad crossing.

The surface of the ground south of the tracks and west of the highway was comparatively level and slightly lower than the highway and tracks. West of the highway and immediately south of appellee's right of way there was a field of tomatoes and cucumbers. South of this vegetation there was a field of popcorn planted June 28th, the height of which was estimated by the owners to be from 4 to 4½ feet. A witness for appellant testified the corn was from 6 to 7 feet high.

The train, approaching from the west, consisted of the motorcar or locomotive, a boxcar, a cinder car, and a caboose. The locomotive was 12 feet 4 inches high, the boxcar 13 feet 8 inches high, the cinder car 8 feet, and the caboose 13 feet 6 inches in height. The train was 144 feet in length. The transmission lines and trolley poles were 33 feet above the ground. There was a railroad-crossing sign about 4 feet high, erected and maintained by the highway commission, about 30 feet north of the Wabash tracks and about 15 feet east of the pavement. It was the standard highway commission sign containing the letters "R. R."

On the east side of the pavement and south of appellee's

tracks about 25 feet was a sign with the lettering "RAILROAD CROSSING." The lettering was 8 inches high. About 30 feet north of the tracks and west of the pavement there was a standard railroad sawbuck warning sign.

Exhibit D-1, which is here inserted, is a fair representation of the signs maintained by appellee as they were on the day of the accident. The exhibit also shows a part of the skid marks made by the tires of decedent's car as he approached the crossing.

With reference to the railroad warning sign south of the tracks an employee of appellee testified:

"These signs was put up for extra precaution. They

thought they would make a few of them and put them up at a few crossings—thought it would help attract attention so they would pay more attention to the crossing—is what they were put up for. They was only put up at a few crossings to try it out.''

The signs were plainly visible from the Wabash tracks which were 510 feet south of the crossing. The train was equipped with air brakes, hand brakes, sand valve, and air-operated bell and whistle. These instrumentalities were in good operating condition at the time of the accident. The train approached the crossing at a speed of about 25 miles an hour. The speed of the automobile was variously estimated at from 65 miles to 100 miles per hour. We are satisfied that the automobile was being driven about two and one-half to three times faster than the train, or approximately 65 miles per hour. The automobile was on the east side of the pavement as it approached the crossing and ran into the motorcar.

At the time of the collision the front part of the locomotive had passed the east edge of the pavement and was struck by the automobile back of its front trucks. The front part of the motor-car was derailed. The crash was heard one-half mile away. Decedent was driving a 1937, four-door, 143-horsepower Buick sedan, weight about two tons, and it could be driven from 80 to 95 miles per hour.

I. Section 8018, 1939 Code, reads, in part:

''8018 Signals at road crossings. A bell and a steam whistle shall be placed on each locomotive engine operated on any railway, which whistle shall be twice sharply sounded at least sixty rods before a road crossing is reached, and after the sounding of the whistle the bell shall be rung continuously until the crossing is passed * * *.''

Appellant's first assignment is that a conflict in the evidence required the question of compliance with this statute to be submitted to the jury.

Appellee concedes the signals were not given 60 rods west of the crossing but contends its negligence to observe this statutory requirement was not a proximate cause of the accident.

Because of our disposition of the case it is unnecessary to pass on this issue.

However, we should consider whether there is a conflict in the evidence on the question whether the signals required by the statutes were given before the crossing was reached. The engineer, brakeman, and Roadmaster Stites, who was on the train, testified the whistle was sounded and the bell was rung about 500 feet west of the crossing, and five disinterested witnesses for appellee testified the signals were given from 250 to 300 feet west of the crossing.

Two witnesses for appellant, Mr. Matthai and Mr. Feldman, testified that they did not hear a whistle or bell. They were approaching the intersection from the north in Mr. Feldman's car, which was two years old, at a speed of from 45 to 50 miles per hour. The car windows were open. They saw the train close to the highway when they were 1,000 feet north of the tracks. They were engaged in conversation when they approached the intersection. Mr. Feldman testified on cross-examination:

"As we were coming south Mr. Matthai and I were engaged in conversation. I do not remember of anything in particular we were talking about. It was not about the railroad crossing. * * * Q. Now, Mr. Feldman, when you say you didn't hear a whistle or bell the most you want the jury to understand is you didn't notice any whistle or bell? A. No, I did not. Q. You don't want to tell the jury that the whistle or bell didn't ring, do you? A. No I don't. Q. And you weren't paying any particular attention to that feature? A. No, I wasn't. Q. You wasn't looking for it? A. No. Q. And you merely want to say you don't recall hearing it? A. I don't recall, no sir. Q. As I understand it, you were in conversation with Mr. Matthai up to the time you reached this crossing? A. Yes, sir."

On redirect examination he testified:

"Q. You testified that at no time did you hear a train whistle or train bell? A. That is right. Q. Do you know any reason why you could not have heard a train whistle or train bell if same had been blown? A. I don't know—the only

reason I have is because I was conversing with Mr. Matthai and paid no attention to it."

Mr. Matthai testified:

"Q. Now, as I understand it, according to your testimony as you were approaching this crossing from the north, coming down from Albia, you were in conversation with Mr. Feldman and was not paying any particular attention to anything? A. That is right. Q. What you merely want to tell the jury is that as far as you recall you didn't hear a whistle blow or a bell rung? A. That is right. Q. You don't want to say to this jury that a whistle was not blown or a bell was not rung—merely that you didn't hear one, isn't that right? A. I did not hear either a whistle or a bell. Q. That is all you want the jury to understand, that you did not hear them yourself? A. That is right."

Neither Mr. Feldman nor Mr. Matthai heard the crash. In view of the positive evidence the signals were given, the negative evidence of the witnesses does not, under the circumstances, create a conflict in the evidence. Lenning v. Des Moines & C. I. R. R., 209 Iowa 890, 894, 227 N. W. 828.

II. Section 8000, 1939 Code, provides that every corporation operating a railroad shall erect at all points where the railroad crosses a public road, "a sign with large and distinct letters placed thereon, to give notice of the proximity of the railway, and warn persons of the necessity of looking out for trains."

Appellant states:

"We urge two alternative propositions:

"1st: Sec. 8000 requires the maintenance of a warning sign at railroad crossings on both sides of the highway.

"2nd: Even if the statute was not so construed to require signs on both sides of the highway, ordinary care at any intersection with a paved trunk highway would require signs on both sides of the highway."

We cannot agree with her propositions. The statute requires a sign at the crossing for the purpose of warning travelers

of the proximity of the tracks and the standard sawbuck sign north of the tracks and west of the highway complied with the statute. In Dolan v. Bremner, 220 Iowa 1143, 1146, 263 N. W. 798, 799, plaintiff was approaching the tracks from the west. The court said:

"It appears without dispute in the evidence that the railroad company did comply with the requirement of our statute by maintaining on the east side of its railroad tracks and to the north side of the highway the ordinary cross-arm warning sign."

With reference to appellant's second proposition, it is well settled in this state that if a railroad crossing is peculiarly and unusually hazardous it is for the jury to say whether warnings and safeguards in addition to statutory requirements should be provided to give reasonable protection to the public. Butters v. Chicago, M., St. P. & P. R. Co., 214 Iowa 700, 243 N. W. 597; Glanville v. Chicago, R. I. & P. R. Co., 190 Iowa 174, 180 N. W. 152; O'Brien v. Chicago, R. I. & P. R. Co., 203 Iowa 1301, 214 N. W. 608.

The photos before us and the testimony of the witnesses persuade us that this crossing was not more than ordinarily hazardous.

If it were to be conceded that because of the character of the crossing and its surrounding conditions it required an additional sign on the south side of the tracks and east of the highway, the sign shown in Exhibit D-1 fairly warned a traveler from the south of the proximity of the appellee's railroad tracks.

III. Appellant alleges the court erred in ruling that decedent was contributorily negligent. We are of the opinion that the trial court was right in so ruling.

A railroad crossing is inherently a place of danger and requires the exercise of care, by the person about to cross the tracks, commensurate with the danger. Such person must vigilantly use his senses to determine whether there is danger in crossing the tracks. In High v. Waterloo, C. F. & N. R. Co., 195 Iowa 304, 307, 190 N. W. 331, 333, the court, speaking through Mr. Justice Faville, said:

"A person approaching a railway crossing is bound to know that he is approaching a dangerous place. As one has laconically said, 'It is always train time at any railroad crossing.' To be free from negligence, one must exercise the degree of care and caution that a man of ordinary care and prudence would exercise under the same or similar circumstances.

"In Hinken v. Iowa Cent. R. Co., 97 Iowa 603, we said:

" 'We have iterated and reiterated the doctrine that a railway track is always a place of danger, and that it is the duty of one about to cross it, even in the absence of any special warnings or signals on the part of those in charge of the train, to use his senses in order to avoid injury.' * * * He must do *all* the acts and things that a man of reasonable care and caution would do at the time and place."

In Dean v. Chicago, B. & Q. R. Co., 211 Iowa 1347; 1351, 229 N. W. 223, 225, we said:

"Even the failure of the engineer to ring the bell or sound the whistle, if such be the fact, does not relieve the traveler about to cross a railroad track from the necessity of taking ordinary precaution under the circumstances which confront him."

Although appellee did not sound the whistle 960 feet west of the crossing, this negligence did not relieve decedent from exercising due care to avoid injury, from the duty of vigilantly using all of his senses to determine whether there was danger from trains approaching the crossing.

The purpose of the warning signs and signals is to warn persons using the highway of the danger of approaching trains and not to prevent them from running into a train on the crossing over the highway. Dolan v. Bremner, 220 Iowa 1143, 263 N. W. 798. If the crossing whistle, two longs, a short, and a long whistle, was given only 250 feet west of the crossing, decedent would have been approximately 620 feet south of the tracks. The bell rang continuously until the crossing was passed after the crossing whistle was given. The whistle and bell, the railroad signs, and the highway commission sign close

to the Wabash tracks warned decedent of the proximity of the railroad tracks and of the necessity for looking out for trains.

Five witnesses for appellee testified that a traveler in approaching the crossing from the Wabash tracks and in looking northwest across the cornfield could plainly see a train approaching from the west. This evidence is supported by the testimony of Mr. Adams, a registered engineer, employed by appellee in its engineering department. He stated that approximately the top 25 feet of the transmission lines and trolley poles were visible from the Wabash tracks. The lower 7 or 8 feet of the poles were not visible. The popcorn, which was planted on June 28th, was estimated by two of appellant's witnesses to be 6 or 7 feet tall, although it had been planted less than two months at the time of the accident. As stated, the owners of the land and other witnesses testified the popcorn was from 4½ to 5 feet high. Assuming it was 7 feet high, the locomotive was 12 feet high, the boxcar nearly 14 feet high, and the caboose 13½ feet high. A witness for appellant testified:

"At a point approximately 250 feet south of the I. S. U. crossing a train could have been seen approaching from the west. I would say probably a thousand feet or more. A view of the tracks could be had to the west at a point farther than 250 feet from the intersection."

The north edge of the cornfield was 111 feet south of the tracks. The popcorn field only partially obscured the view of the train as decedent proceeded north from the Wabash tracks and the rails were plainly visible.

Appellee's engineer measured the skid marks and found that they commenced 182 feet south of the crossing and continued to the tracks. Exhibit D-1, which does not purport to show the full length of the marks, corroborates this witness. We are satisfied that appellant's witness who testified that the skid marks were only 75 feet long was mistaken. In fact, appellant concedes in her argument that decedent might have skidded his car 175 feet. Although decedent was duly warned of the danger of approaching trains at least 600 feet south of the tracks, it is, quite apparent that, in heedless disregard of his own safety,

he continued to drive at approximately 65 miles an hour until he was within about 250 feet of the crossing, at which time he apparently saw the train. As stated in appellant's argument:

"When Mr. Hitchcock got within 250 feet of the I. S. U. crossing he could see a train on the track and obviously did see a train on the track."

In Luse v. Nickoley, 231 Iowa 259, 3 N. W. 2d 503, it appeared the "thinking distance" for applying brakes on a car driven 50 miles per hour is 55 feet. Mr. Hitchcock apparently saw the train when he was about 250 feet south of the crossing and then applied his brakes. The evidence is that the speed of his car was not materially reduced during the braking period. The impact tilted the locomotive but did not turn it over.

Section 5023.01, 1939 Code, reads, in part:

"5023.01 Speed restrictions. Any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway *and of any other conditions then existing * * *.*" (Italics supplied.)

After due warning of the proximity of the tracks and the approaching of the train 500 or 600 feet south of the crossing, decedent did not attempt to reduce his speed or proceed with caution toward the crossing until within approximately 250 feet thereof. He drove into the danger zone, a position of peril, at a speed that made it impossible for him to avoid the collision.

We can only conclude from this record that decedent, after due warning, did not exercise that care and caution and prudence in approaching the crossing required by law. It cannot be said, under this record, that decedent did not contribute in some degree to the injuries resulting in his death.

IV. Another proposition advanced by appellant is that appellee must respond in damages under the last-clear-chance doctrine.

The testimony of Motorman Neely is substantially as follows:

When he was about 200 feet from the crossing, traveling at 25 miles per hour, he observed decedent's car at the Wabash

crossing. At this time he did not think there was going to be an accident. After looking north, he again looked south when his train was about 100 feet west of the crossing and observed the automobile about 250 feet south of the tracks. "He was coming at a high rate of speed, I thought—from 65 to 85 miles an hour." He immediately stopped his long whistle and went into short blasts, threw off the current, applied the emergency air brakes and released the sand valve. He continued the alarm blast of the whistle to the place of the collision, at which time the speed of the automobile was about 60 miles an hour and the speed of the train was reduced to 20 miles an hour. The train stopped about 120 feet east of the pavement. Traveling at 25 miles per hour, the train could be stopped in a distance of about 275 feet.

The brakeman testified he first observed the car at the Wabash tracks. When it was 250 feet south of the crossing, he saw "smoke coming off his casings and out from under the car. * * * I could hear this shrieking noise [of the tires] on the pavement." At said distance, the engineer applied the brakes and gave the alarm blasts of the whistle.

"Q. Just tell the jury what did happen there as you were crossing that crossing. A. Well, the engineer tried to make an emergency stop and he got out over the half way line of the paving, going east, and this automobile hit the engine right under the cab window—right in the extreme front end of the motor—of the engine."

The roadmaster testified the air brakes were applied and current thrown off and the rails sanded about 90 feet west from the crossing and that the automobile was traveling 50 miles an hour and the train 20 miles an hour at the time of the collision.

The train crew first observed the automobile over 500 feet from the tracks, at which time decedent was not in a position of peril. The signs and signals warned decedent at that distance that there was a railroad crossing ahead, and they had a right to assume that he would use due care for his own safety and proceed cautiously into the danger zone taking all reasonable care and measures to determine whether or not a train was approaching.

Ordinarily, a traveler on the highway who has been warned of the proximity of railroad tracks is not in a position of peril 250 feet from a crossing, but in this case the motorman, observing the undiminished speed of the automobile at that distance, when his train was 100 feet west of the crossing, used all the instrumentalities available to avoid the collision. Prior to this time the crew had no reason to believe that a collision was imminent. Appellee's employees discovered decedent in a position of peril when the train was from 90 to 100 feet west of the crossing, and, as stated, the train could not be stopped within a distance less than 275 feet. The record shows appellee's employees did all that could be done to prevent the collision after they discovered the decedent in a position of peril, at which time it was too late, by the exercise of reasonable care, to prevent the accident. In Williams v. Mason City & Ft. D. R. Co., 205 Iowa 446, 453, 214 N. W. 692, 694, the court said:

"Appellee suggests that said trainman saw the approaching automobile 100 to 150 feet south of the crossing. The conductor so testifies. That, however, does not overcome the difficulty. Travelers in motor vehicles frequently and customarily drive toward an on-coming train and stop just before going upon the tracks, in order to permit the train to proceed on its way. There is in such conduct, however, no 'peril,' until such wayfarer fails to stop in a zone of safety. Those in charge of the train have a right to assume that he will not drive into danger. Albright v. Chicago, R. I. & P. R. Co., 200 Iowa 678; Vreeland v. Chicago, M. & St. P. R. Co., 92 Iowa 279."

In Lenning v. Des Moines & C. I. R. R., 209 Iowa 890, 893, 227 N. W. 828, 829, the court said:

"Suppose, however, that the decedent was in plain view of the train while he was 600 feet away from the intersection. Was the motorman bound to assume, at such a distance, that the decedent did not also see the on-coming car? Surely a train is not bound to come to a stop simply because its motorman sees an automobile 600 feet distant from a crossing. Nor should he be required to put on its brakes or to slow down at such a distance."

**314**

See Arp v. Illinois Cent. R. Co., 230 Iowa 869, 299 N. W. 413; Gilliam v. Chicago, R. I. & P. R. Co., 206 Iowa 1291, 222 N. W. 12.

V. Appellant's last assignment is that she was not permitted to show the habits and methods and customs of decedent in driving an automobile, and particularly his method of driving at railroad crossings. In Scott v. O'Leary, 157 Iowa 222, 227, 138 N. W. 512, 514, we said:

"Where there are no eyewitnesses of a transaction, it has been held that testimony as to the habits of one whose conduct is in question, may be shown as bearing upon his care or the want of it. Frederickson v. Railroad Co., 114 Iowa, 26."

See Darden v. Chicago & N. W. Ry. Co., 213 Iowa 583, 239 N. W. 531.

But in the instant case there is direct testimony of the acts and conduct of decedent, of the manner in which he drove his car from the time he crossed the Wabash tracks until he reached the point of collision. The testimony of the witnesses and the physical facts preclude the application of the no-eyewitness rule.

In Stark v. Tabor & N. R. Co., 161 Iowa 393, 403, 142 N. W. 977, 980, it stated:

"The direct testimony covers practically every interval from the time the deceased concluded to leave his own train down to the time he was struck, and we do not think the presumption, even if it arose, as to a very short period of time, was sufficient to take the case to the jury."

See Brown v. McAdoo, 195 Iowa 286, 188 N. W. 7.

In connection with this issue and with reference to appellant's burden of proof, we state that we find nothing in the record to show that decedent was exercising the care for his own safety which a reasonably prudent man would exercise under similar conditions.—Affirmed.

WENNERSTRUM, C. J., and BLISS, SAGER, HALE, and MILLER, JJ., concur.