**Chester LEVENDOSKY, Appellant,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILWAY COMPANY,**
Appellee.

**No. 15205.**

United States Court of Appeals
Eighth Circuit.

June 15, 1955.

John N. Hughes, Des Moines, Iowa (James J. Lamb, Davenport, Iowa, and H. R. Duncan, Des Moines, Iowa, were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

GARDNER, Chief Judge.

This was an action brought by appellant to recover damages for personal injuries sustained by him in a railroad crossing accident. The accident occurred in the City of Davenport, Iowa, on U. S. Highway No. 6 on December 22, 1953. The parties will be referred to as plaintiff and defendant respectively. At the time of receiving his injuries plaintiff was driving a so-called tractor-trailer truck loaded with cattle which he was transporting from the vicinity of Durant, Iowa, to Chicago, Illinois. The highway which runs east and west crossed the railroad track of the defendant which runs north and south at right angles. The plaintiff claimed negligence on the part of the defendant in that it (1) failed to keep a proper lookout for vehicles lawfully and properly using said highway at or near said grade crossing; (2) failed to have said train under proper control; (3) failed to have said engine of said train equipped with a proper and efficient collar brake; (4) failed to stop said train before the collision and after the defendant's employees saw the plaintiff in a position of peril from which he could not extricate himself; and (5) failed to bring said train to a stop within a reasonable period after the collision. The defendant answered denying all of the alleged acts of negligence and pleaded affirmatively that plaintiff was guilty of negligence and that said negligence contributed to his injuries.

U. S. Highway No. 6 is of concrete construction, the hard surface being twenty feet in width. On the day in question it was clear and the temperature was about ten degrees above zero. Plaintiff's tractor-trailer was one of two units. The other tractor-trailer, also

Elliott R. McDonald, Davenport, Iowa (McDonald & McCracken, Davenport, Iowa, were with him on the brief), for appellant.

loaded with cattle being transported to the Chicago market, followed plaintiff but when it reached the so-called crest of the hill it drove into a driveway on the shoulder of the road. One Hugo Fitzer was riding with plaintiff from Durant, Iowa, and the highway to within about 1140 feet west of the crossing had occasional spots of ice on it but was traversed without mishap or difficulty until plaintiff reached the crest of a slight hill opposite what is referred to in the record as the Wittenmeyer School barns. The highway from this point is a slight downgrade flattening out as it approaches the railroad crossing and rising .67 feet the first hundred feet west of the crossing and 1.26 feet the second hundred feet west of the crossing. As plaintiff reached a point in the highway directly opposite the Wittenmeyer School barns he observed that from that point on to the railroad crossing the highway was a glare of ice. He was familiar with the location of the crossing and also with the highway, having traversed it many times. When he arrived at this point he was driving at a speed of twenty-five to thirty miles per hour on the south half of the highway. By the application of brakes on his trailer and the brakes on his tractor from time to time he succeeded in reducing his speed and when he reached a point about one-third of the way down the hill his speed was about eighteen miles per hour, and when he reached a point about four hundred feet west of the crossing his speed had been further reduced to ten or twelve miles per hour. When he reached a point fifty to seventy-five feet from the crossing he locked his brakes and was going three to five miles per hour. Because of the slippery paving, however, he was unable to stop his vehicle and he crashed into the side of defendant's locomotive which was traveling south over the crossing. Up to the time of the collision plaintiff thought he would be able to stop his vehicle and avoid a collision, and Mr. Fitzer who was riding with him also thought the tractor-trailer would be stopped in time to avoid a collision.

When plaintiff was about nine hundred feet west of the crossing he observed defendant's train as it approached the crossing from the north when it was about five hundred feet from the crossing and the view was unobstructed. There is some dispute in the evidence as to the number of cars in the train. The defendant's testimony is positive that the train consisted of a locomotive, three cars and a caboose, while the witnesses for the plaintiff "estimated" the number of cars as six or seven. The locomotive was running backwards but was hauling the cars so that it was in the lead and there was attached thereto the usual tender. The train crew consisted of the engineer, the fireman, the conductor and the brakeman. As the engine was being driven backwards the engineer was on the east side of the engine cab and the fireman was on the west side of the cab, while the conductor was in the west bay window of the caboose. The conductor and the fireman observed the plaintiff's tractor-trailer when the train was about five hundred feet north of the crossing and the tractor-trailer was about nine hundred feet from the crossing, and the plaintiff observed the train at approximately the same time and the train was in plain view of the plaintiff from the point where he first observed it until the collision occurred. When the plaintiff's truck was thirty-five to forty feet from the crossing the conductor on the defendant's train pulled the brakes for an emergency stop. At about the same time the fireman shouted to the engineer to "hole her", and the engineer also applied the emergency brake when the leading end of the engine was on the north end of the crossing. While plaintiff had difficulty in reducing the speed of his tractor-trailer by the application of his brakes he succeeded in keeping his tractor-trailer in the south lane of the highway, never having crossed the center line to the north lane. When the tractor-trailer crashed into the side of the locomotive plaintiff was thrown from his seat and struck by some part of the moving train. Details of the evidence will

be further developed in the course of this opinion.

At the close of all the testimony the defendant moved for a directed verdict substantially on the ground that plaintiff had failed to prove any acts of negligence which were the proximate cause of the accident and that it appeared that the proximate cause of the accident was the icy condition of the highway and that there was no evidence to sustain the plaintiff's claim that the defendant, after discovery of plaintiff's peril, could by the exercise of reasonable care have avoided the accident. The court sustained this motion and entered judgment dismissing plaintiff's complaint. From the judgment so entered plaintiff prosecutes this appeal.

In seeking reversal plaintiff contends substantially that there was sufficient evidence before the court to submit this case to the jury on the following grounds:

1. Defendant failed to keep a proper lookout for vehicles lawfully and properly using this highway at or near the grade crossing.

2. Defendant's train crew failed to have the train under proper control.

3. Defendant failed to stop said train before the collision and after the defendant's employees saw the plaintiff in a position of peril from which he could not extricate himself.

4. Defendant failed to bring said train to a stop after the collision within a reasonable period.

5. Defendant failed to have the train equipped with a proper efficient power brake.

Plaintiff contends that the jury under the evidence might have found that the defendant failed to keep a proper lookout. The contention is thus stated in plaintiff's brief:

"It is the contention of the plaintiff that if the conductor and fireman had been keeping a *proper* lookout, that while they were observing the plaintiff going through all his difficulties they certainly could have ascertained that he was in trouble *and that he could not help himself.* * * * The inference is that since the plaintiff was gradually slowing down his truck, they thought that he would get stopped before reaching the railroad crossing."

The evidence was undisputed that the fireman and the conductor of the defendant's train crew first observed plaintiff when he was about nine hundred feet west of the crossing and they continued to observe him as he approached and as the train also approached the same crossing. When the plaintiff reached a point between thirty-five and forty feet from the track the conductor, observing that plaintiff had not stopped, set the emergency brake and at the same moment the fireman warned the engineer to "hole her", to which the engineer responded by applying the emergency brake. There was nothing to warn the train crew that the plaintiff would not or could not stop his tractor-trailer before reaching the railroad track and in fact plaintiff testified that he thought he would be able to stop it, as did also Mr. Fitzer who was riding with him. Touching this situation the plaintiff testified that, "Up to the time of impact I figured on stopping without a collision." In this situation under the governing law of Iowa the train crew were under no duty to stop the train until the vehicle on the highway had entered the zone of danger. Williams v. Mason City & Ft. D. Ry. Co., 205 Iowa 446, 214 N.W. 692; Simmons v. Chicago, R. I. & P. Ry. Co., 217 Iowa 1277, 252 N.W. 516; Arp v. Illinois Cent. R. Co., 230 Iowa 869, 299 N.W. 413; Mast v. Illinois Cent. R. Co., D.C.Iowa 79 F. Supp. 149; Mast v. Illinois Cent. R. Co., 8 Cir., 176 F.2d 157. There is no evidence that the train crew knew of the icy condition of the highway. As has been observed, during the period that the plaintiff's tractor-trailer was visible to the members of the train crew it never left the right lane and certainly if the driver of the tractor-trailer and his companion did not realize that there

was danger of collision it could not reasonably be contended that members of the train crew, observing the movement of the tractor-trailer, should have realized such danger before the parties in charge of the tractor-trailer. Referring to a situation strikingly similar to that here presented the Supreme Court of Iowa in Williams v. Mason City & Ft. D. Ry. Co., supra [205 Iowa 446, 214 N.W. 695], said:

"Travelers in motor vehicles frequently and customarily drive toward an oncoming train and stop just before going upon the tracks in order to permit the train to proceed on its way. There is in such conduct, however, no 'peril' until such wayfarer fails to stop in a zone of safety. Those in charge of the train have a right to assume that he will not drive into danger."

In Simmons v. Chicago, R. I. & P. Ry. Co. [217 Iowa 1277, 252 N.W. 517] supra, the same teaching is announced as follows:

"Of course, as a general proposition of law, it is true that there is a duty imposed upon the appellant, while operating its trains, to keep a proper lookout through its employees. * * * Here the evidence reveals that the appellant, through its engineer, kept a constant lookout from the time the motor train left the depot until the collision. * * * under the record, it cannot be said that the engineer did not keep a proper lookout when proceeding from the depot in Farmington to the crossing where the accident occurred. Frequently automobile drivers propel their vehicles to a point near the railroad tracks before stopping for the crossing. Engineers constantly observe operations of that kind. So, when an engineer observes an on-coming automobile traveling at the rate of from 25 to 30 miles an hour, he may not detect, under the facts of this case, the peril of the occupants of the car

until it is within 100 feet of the railroad track."

In Arp v. Illinois Cent. R. Co., supra, a situation resembling in many respects that here present was before the court. The court, among other things, said [230 Iowa 869, 299 N.W. 414]:

"In the case at bar the automobile was not moving rapidly. The fireman was not required to anticipate its going upon the track until it became apparent to him, as a reasonably careful and prudent person, that it would not or could not stop."

In Mast v. Illinois Cent. R. Co., D.C. Iowa, 79 F.Supp. 149, 163, affirmed by us in Mast v. Illinois Cent. R. Co., 8 Cir., 176 F.2d 157, Judge Graven after an exhaustive review of the Iowa decisions on the question here under consideration gave it as his considered conclusion that:

"It is the law of Iowa that those in charge of the operation of a train have the right to assume that a motorist approaching a railroad crossing will stop in a zone of safety, and that he will not drive into the zone of danger of a crossing when the train is approaching."

On this phase of the case we conclude that there was no evidence which would have warranted a jury in finding the defendant negligent in failing to maintain a proper lookout.

It is next contended that the evidence was such that a jury might reasonably have found that defendant's train crew failed to have the train under proper control. As has heretofore been noted this train consisted of a locomotive and from three to seven cars. The locomotive was equipped with Westinghouse air brakes which air brakes operated or braked all driving wheels of the locomotive and also the wheels on the coal tender. The cars and caboose also were equipped with air brakes which worked upon all wheels of the cars. The air brake system normally was controlled by the engineer in the cab of the locomotive but in case of an emergency the brakes also could be applied by the conductor

from the caboose. The fireman estimated that at a speed of twelve miles per hour the train could be brought to a stop in approximately seventy feet by the application of emergency brakes. The conductor estimated that such a stop could be made in somewhere between fifty and one hundred feet. The engineer testified the train could have been stopped in eighty feet. The fireman yelled to the engineer to stop when the truck was from thirty-five to forty feet from the crossing and the conductor applied the brake valve from the caboose when the truck was from thirty-five to forty feet from the crossing. The engineer said the leading end of the locomotive was about on the north edge of the crossing when the fireman yelled, and the engineer, of course, requires some reaction time within which to act, as does an automobile driver. Thus the leading end of the locomotive would be at least partly over the pavement before the engineer could apply the brakes and the brakes could take effect. The engineer testified that the leading end of the locomotive stopped approximately eighty feet south of the south edge of the pavement. It will be noted that the conductor applied the brakes from the caboose at about the same instant as the fireman warned the engineer. The record is that the brakes functioned properly. The contention that the train was not stopped within as short a distance as it might have been would seem to be of little importance because in no event could it have been stopped in time to avoid the collision after knowledge and warning that the plaintiff's vehicle had entered the zone of danger some thirty feet from the point of the collision. The contention of plaintiff in this regard is supported by no citation of authorities and we have found none.

After plaintiff filed his original complaint it was by leave of court amended so as to plead alleged facts as the basis for invoking the doctrine of last clear chance. Defendant in its motion for a directed verdict specifically alleged that plaintiff was not entitled to go to the jury upon the theory of last clear chance because:

"(a) There is no competent evidence that the defendant through its employees became aware that plaintiff was in a perilous position in time to have avoided the collision.

"(b) There is no competent evidence that defendant through its employees when it became aware the plaintiff was in a perilous position failed to use ordinary care to avoid the collision.

"(c) The doctrine of last clear chance is negatived by plaintiff's allegation of negligence that defendant failed to keep a proper lookout for vehicles lawfully and properly using the highway at or near said grade crossing."

As a prerequisite to the right to invoke the doctrine of last clear chance in any personal injury action under the Iowa law there must be shown actual knowledge of facts from which peril to plaintiff could reasonably have been foreseen and sufficient time after such discovery to enable defendant in the exercise of ordinary care to avoid the collision. We had occasion to consider the applicable Iowa law in Mast v. Illinois Cent. R. Co., 8 Cir., 176 F.2d 157, 162, and in the course of the decision in that case we said:

"It is sufficient to say that the Iowa rule presupposes the negligence of the injured person; that his negligence had placed him in a position of peril; that his peril was actually discovered by the defendant; and that, after the discovery of the peril of the person injured, the other party had time by the exercise of reasonable care to avoid the injury."

With this statement of the Iowa doctrine of last clear chance in mind we turn to a consideration of the pertinent facts in this case. They have been largely recited in our discussion of Point I urged by the plaintiff but some further reference may appropriately be made to

certain phases of the evidence. It is suggested that in approaching the crossing over the icy highway plaintiff's manipulation of the brakes in slowing the speed of his vehicle must have caused some gyrations which should have been noticed by members of defendant's train crew. There is, however, nothing in the evidence to indicate that there were any substantial changes in the course of the vehicle. It at no time left the right lane in which it was traveling and at no time did the plaintiff anticipate that he would be unable to stop before reaching the track of defendant and certainly if the movements of the vehicle under his control were not such as to cause *him* to think he was in peril it could scarcely be expected that members of defendant's train crew, viewing it at a very considerable distance, should entertain any such fear. In addition to this is must be borne in mind that the plaintiff knew all about this icy condition of the highway and the members of defendant's train crew did not know of that condition. During the time that defendant's train crew observed the movement of the plaintiff's vehicle it was being gradually slowed down and according to plaintiff's testimony it had been slowed from twenty-five to thirty miles per hour to a speed of three to five miles per hour. In these circumstances the reasonable inference would be that plaintiff was preparing to stop at the crossing and would do so. As observed in many of the decisions of the Supreme Court of Iowa, motor vehicles habitually approach a railroad crossing without any apparent reduction in speed until very near the point of contact. Simmons v. Chicago, R. I. & P. Ry. Co., supra; Hitchcock v. Iowa Southern Utilities Co. of Delaware, 233 Iowa 301, 6 N.W.2d 29; Arp v. Illinois Cent. R. Co., supra; Gilliam v. Chicago, R. I. & P. Ry. Co., 206 Iowa 1291, 222 N.W. 12. It cannot, therefore, be said that the defendant's train crew knew that the plaintiff was in a zone of danger until he approached to within about thirty-five or forty feet of the crossing when he set all his brakes and there was an apparent

"fishtailing" or sliding of the vehicle. The doctrine is succinctly stated by the Supreme Court of Iowa in Hitchcock v. Iowa Southern Utilities Co. of Delaware, supra [233 Iowa 301, 6 N.W.2d 35], where in quoting from Williams v. Mason City & Ft. D. Ry. Co., supra, it is said:

" 'Travelers in motor vehicles frequently and customarily drive toward an oncoming train and stop just before going upon the tracks in order to permit the train to proceed on its way. There is in such conduct, however, no "peril" until such wayfarer fails to stop in a zone of safety. Those in charge of the train have a right to assume that he will not drive into danger.' "

In the earlier case of Gilliam v. Chicago, R. I. & P. Ry. Co., supra [206 Iowa 1291, 222 N.W. 15], the Supreme Court of Iowa announced the applicable law which has apparently been consistently adhered to. It is there said:

"Under the record, after the perilous position of the automobile was in fact discovered by the trainmen, the injury could not have been avoided by the exercise of ordinary care on the part of the men in charge of the train. The employees in charge of the train had the right to assume that the automobile would not be driven heedlessly on the track ahead of the approaching train. It is a matter of common knowledge that automobile drivers frequently drive right up to the track before coming to a stop. Under the record in this case, it is manifest that the employees of the defendant, after they ascertained that the automobile was not going to stop for the crossing, had no time to do more than they did in the preventing of the collision."

In Simmons v. Chicago, R. I. & P. Ry. Co., supra [217 Iowa 1277, 252 N.W. 518], where the doctrine of last clear chance was sought to be relied upon by plaintiff, the court, quoting with approv-

al from State ex rel. North Dakota Workmen's Compensation Board, for Use of North Dakota Compensation Fund v. Great Northern Ry. Co., 54 N.D. 400, 209 N.W. 853, pertinently observed that:

" 'Those engaged in the operation of railway trains are not bound to anticipate that drivers of automobiles and trucks upon the highways will be guilty of negligence in approaching crossings without taking reasonable measures to ascertain the approach of a train. If the rule were otherwise, the last clear chance doctrine would require the trainmen, at the peril of being held responsible for an accident, to slow down every time they should observe an on-coming motorist in a position where, if he did not see the train, he might negligently collide with it.' "

We think the undisputed evidence in this case conclusively shows that plaintiff did not bring himself within the doctrine of last clear chance or discovered peril. In presenting his case to the jury plaintiff testified that under normal conditions upon a dry pavement, moving at a speed of from ten to twelve miles per hour, he could have stopped his vehicle within a distance of less than two hundred feet, or if he had to, within less than fifty feet. Manifestly, the reason why he was unable to stop his tractor-trailer before colliding with the locomotive in the instant case was because the highway was not in a normal condition. It was covered with ice, and it was this situation that was the proximate cause of the accident. Barrett v. United States Railroad Administration, 196 Iowa 1143, 194 N.W. 222; Pifer v. Chicago, M., St. P. & P. R. Co., 215 Iowa 1258, 247 N.W. 625; Hickey v. Missouri Pacific Railroad Corporation, 8 Cir., 8 F.2d 128; Megan v. Stevens, 8 Cir., 91 F.2d 419, 113 A.L.R. 992; Hart v. Wabash R. Co., 7 Cir., 177 F.2d 492. Defendant was not responsible for the icy condition of the highway and its train crew had no knowledge of that condition.

Liability on the part of the defendant is asserted by the plaintiff because of its alleged failure to bring the train to a stop after the collision, it being argued that the movement of the train thereafter caused plaintiff to be struck by steps on the cars. There is no evidence as to what may have struck the plaintiff after the crash and his injury was primarily the result of his collision with the locomotive, and there is no legal basis for an attempt to apportion plaintiff's injuries between the original impact and subsequent moments. Any attempt to do so would be pure speculation. In Illinois Cent. R. Co. v. Nelson, 8 Cir., 173 F. 915, 916, it was claimed that decedent received his fatal injuries from the second or third car which rolled over him and not from the first car which struck him and the court in directing a verdict for defendant among other things said:

"Witnesses testified for the plaintiff that under the conditions which were described the train could have been stopped within from 12 to 20 feet; whereas, it actually ran more than 100 feet after the collision. Deceased, when first struck, was knocked 4 or 5 feet, and fell between and parallel with the rails, with his head to the south. He lay face downward in that position until the first car had passed over him, and was then picked up and rolled by the trucks of the second, and also by those of the third, according to some witnesses, and was mutilated by the wheels. * * * The only evidence of negligence after the discovery of the danger of deceased was the bare fact that the train ran further than the distance within which plaintiff's witnesses said it could have been stopped, and it is claimed that the fatal injuries were inflicted, not by the collision with the first car, but by the trucks and wheels of the car or cars which followed it. * * * We should further say that, giving the fullest

credence to the unusually minute description of what happened to deceased while under the cars, it closely approaches mere conjecture that he was not fatally injured before the second car reached him. We think defendant's motion for a directed verdict should have been granted."

This contention of plaintiff is, we think, wholly without merit.

■ It remains to consider the contention of plaintiff that the defendant was negligent in not having equipped its locomotive with a so-called power brake as required by a statute of Iowa. There is no direct evidence that it had not so equipped its locomotive but this contention is based upon the fact that plaintiff's witness Fitzer testified that at the time of the impact the drive wheel stopped momentarily and then started up again and the alleged testimony of the engineer that when the power brakes were once applied and the wheels stopped they could not be started again as long as the power brake was in application. Defendant challenges the accuracy of plaintiff's statement as to the testimony of the engineer. The engineer on cross-examination was interrogated and answered as follows:

"Q. Suppose a truck interposed itself in the driver and stopped the drivers on the locomotive while your emergency brake was completely on, could these wheels start up again while that emergency brake was on? A. Pardon me, are you trying to get that this truck stopped those drivers; is that the point you are trying to get at?

"Q. I am just asking you. A. That is what I am trying to get clear in my mind.

"Q. Well, is that possible? A. No."

It is to be noted that the witness put his construction as to the meaning of the question asked him and counsel in response to this interrogatory said, "I am just asking you." Was counsel asking the witness the question as interpreted by the witness or the question as counsel interpreted it? We think it fairly clear that the witness thought he was answering the question as he had construed it. In other words, he in effect was testifying that in his opinion it was impossible for the truck to stop the driver wheels of the locomotive. Be that as it may, however, the undisputed fact remains that the collision occurred at the time of the alleged stoppage of the drive wheel and the damage was then done. Plaintiff's vehicle, according to the undisputed testimony, struck the locomotive at a point thirty feet behind the leading end. The speed of the truck at the crossing was from three to five miles per hour. In these circumstances a collision was inevitable whether the locomotive had been equipped with a power brake or not, or whether the brakes had been applied a little sooner or if the train could have been stopped in a shorter distance. If the drive wheel had not again moved the situation would not have been changed, so that the alleged failure to equip the locomotive with a so-called power brake had no bearing upon the collision.

In this case it is observed that no complaint is made as to the rulings of the court on the admissibility of evidence and there is no substantial conflict in the evidence as to any material fact. A careful consideration of the entire record convinces us that the court did not err in directing a verdict in favor of the defendant, which is the only alleged error complained of. The judgment appealed from is therefore affirmed.